GULF REFINING CO. OF LOUISIANA *et al. v.* TERRY.

(In Banc. June 6, 1932.)

[142 So. 457. No. 29517.]

**J. Morgan Stevens**, of Jackson, for appellant.

Alexander & Alexander, of Jackson, for appellant.

**W. E. Morse**, of Jackson, for appellee.

Argued orally by **J. Morgan Stevens**, and **James Alexander**, for appellant, and by **W. E. Morse**, for appellee.

**Smith, C. J.**, delivered the opinion of the court.

This is an appeal from a decree of the court below, granted for the purpose of settling the controlling principles of the case.

The appellants are the successors in title to an oil and gas lease executed in February, 1929, by the board of supervisors of Hinds county, authorizing the lessee to drill wells for oil and gas on a sixteenth section land, and to remove and appropriate any oil and gas found therein.

The land is one of the sixteenth sections donated to the state by the national government for the benefit of its public schools. It is in the possession of the appellee, Terry, who claims under a lease which he holds by mesne conveyances, executed in November, 1846, by the public school trustees of the township in which the land is situated, under a statute enacted on February 27, 1833, by which they were authorized to lease the sixteenth section lands ''for the term of ninety-nine years,'' and ''convey the right, title, use, interest and occupation of said sections, or any such parts as may be leased to the lessee or lessees, for and during, and until the full end of the term of ninety-nine years.'' The operative words of the lease are that: ''In consideration of the premises, the said parties of the first part, as trustees as aforesaid, . . . have sold, leased, remised and to farm let the above described land to the said Moseley and his assigns for and during the term of ninety-nine years.''

Terry is using the land for agricultural purposes. The appellants entered the land over Terry's protest, and were preparing to drill wells thereon for oil and gas when they were excluded therefrom by Terry. Thereafter the appellants exhibited an original bill in the court

below, setting up, in substance, the foregoing, and praying that Terry be enjoined from interfering with their entry on the lands, drilling wells for oil and gas, and removing such as may be found therein.

The court below dissolved a preliminary injunction granted the appellants, and granted them an appeal to this court to settle the controlling principles of the case.

The question for decision is: May the owner of land, after leasing it for a term of years, without any restriction in the lease on the lessee's right to the possession and occupation thereof, drill for and remove any oil or gas that may be therein, and thereby exclude the lessee of the land from the possession of so much thereof as may be necessary for the removal of the oil and gas therefrom? We are clearly of the opinion that this question should be answered in the negative.

Boards of supervisors are now vested by statute with the supervision and control of sixteenth section land, and under chapter 318, Laws of 1926, now appearing as sections 6762 and 6763, Code of 1930, they are authorized to lease such lands "for oil, gas, and mineral exploration and development." Leases made under this statute confer on the lessees no greater right to enter sixteenth section land for "oil, gas, and mineral exploration and development," than the lessor, the state, has. And the lease to the land here in question made in 1846, under which the appellee, Terry, claims, vested in the lessee and his successors in interest every right which the statute under which it was executed authorized the public school trustees to convey.

Those rights were fixed when the statute was enacted and the lease executed; and, if the words used in the statute and lease had a fixed meaning when the one was enacted and the other made, that meaning must be given them here. Dantzler Lumber Co. v. State, 97 Miss. 355, 53 So. 1, 6, wherein a lease executed under this statute

was under consideration; and Daily v. Swope, 47 Miss. 367.

The meaning of the term "land" was fixed by the common law centuries ago, and includes, not only the surface of the soil, but everything under and above it, unless it appears from the instrument in which it was used that the parties thereto intended for it to have a more restricted meaning. Dantzler Lumber Co. v. State, supra. In that case, wherein a lease executed by public school trustees under the statute hereinbefore referred to was under consideration, Judge ANDERSON, in a separate opinion, set forth with approval the following quotations from Coke and Blackstone: " 'It is elementary that "land" itself in legal contemplation extends from the sky to the depths. "The term 'land' includes, not only the ground or soil, but everything which is attached to the earth, whether by the course of nature, as trees herbage, and water, or by the hand of man, as houses and other buildings; and it has an indefinite extent upwards as well as downwards, so as to include everything terrestrial under or over it." ' Coke, Litt. 4a. 'Land comprehends all things of a permanent and substantial nature being a word of very extensive signification; also, if a man grants all his lands, he grants all his mines of metals, and his fossils, his woods, his waters, and his houses, as well as his fields and meadows.' 2 Bl. Comm. 16-18."

In that case the state had filed a bill in equity to cancel a conveyance by a board of supervisors to the lessee of a sixteenth section of the trees growing thereon. The conveyance was made by the board under the provisions of section 4702 of the Code of 1906. The question presented for decision was whether that statute, which authorized the sale of the trees, violated section 211 of the Constitution of 1890, which requires the legislature to enact such laws as "shall provide that the sixteenth section lands reserved for the support of township schools

shall not be sold, nor shall they be leased for a longer term than ten years for a gross sum.'' In order to decide the question, it became necessary for the court to determine the meaning of the term ''lands'' as used in the Constitution. A majority of the court admitted that its usual meaning was as there set forth by Judge ANDERSON; but held, giving its reasons therefor, that it was used in that section of the Constitution in a more restricted sense, and was not there intended to include trees growing on the land. The meaning of the term ''land'' there set forth in Judge ANDERSON's opinion is so universally approved that a conveyance of land is always held to vest in the grantee not only the surface thereof, but everything over and under it, and a conveyance of any separate part thereof, whether over or under the surface, must be executed in accordance with the provisions of the statute of frauds.

In Moss Point Lumber Co. v. Harrison County, 89 Miss. 448, 42 So. 290, 873, this court held that a lease to sixteenth section land, under the statute hereinabove referred to, created, between the state and the lessee, the relation of landlord and tenant, and therefore the lessee could not so use the land as to destroy or impair the value of the state's reversion. We are not concerned here, however, with what use the lessee can make of the leased premises, but with his right to the exclusive possession thereof.

Under the common law in vogue when this lease was executed, there being no provisions in the lease to the contrary, it conveyed to the lessee the right to the exclusive possession and occupation of every part of the land, with which possession and occupation the landlord has no right to interfere. Moreover, the lease containing no provision to the contrary, there arises from it by implication a covenant for the quiet enjoyment of the leased premises by the lessee against the lessor and all persons claiming under him. This covenant is broken the

moment the possession of the lessee is invaded by the lessor for any other purpose than to discharge an obligation the lessor may owe to the lessee or to the public; or to restore such destroyed improvements as the lessor has the right to restore. All of this is so universally held by the courts to be the law now, and to have been such at the time this lease was made, that the citation of authorities therefor would be supererogatory.

But it is said, in substance, that a lease to land, in the absence of a provision to the contrary, does not confer on the lessee the right to remove and dispose of any valuable mineral, including oil and gas, that may be therein; which for the purpose of the argument we will assume to be true, though it may be—as to which we express no opinion—that a lessee has the right to use the minerals in the land for certain purposes. From this it is also said, in substance, that a qualification or exception to the rules hereinbefore announced arises, which is, that the lessor has the right to enter the leased land and remove the minerals therefrom, and to exclude the lessee from the possession of so much of the surface of the land as may be necessary for that purpose. In other words, the case presented is said, in substance, to be the same as if the lessor had expressly reserved to himself the oil and gas that might be contained in the land; from which reservation it is said that an easement in the landlord to enter and remove the oil and gas arises because of the necessity therefor.

There can be no merit, in our judgment, in this contention, for as we have hereinbefore demonstrated, the lease does convey to the lessee the right to the exclusive possession of all of the land, including that under as well as that composing the surface thereof. What use the lessee can make of things lying under the surface, as I have hereinbefore stated, is of no consequence here; the question here being only his right vel non to the possession thereof.

The same result would follow, and for the same reasons, even if the common law as heretofore understood should be so modified as to cause such a lease to vest in the lessee the right only to the surface of the land, and not to possession of things above and below the surface.

It must not be overlooked that the implication here claimed is not of a grant, but of a reservation in a grant, between which there is a clear distinction. 19 C. J. 920, wherein it is said, in subdivision (a) of note 74, that: "There is a clear distinction between implied grants and implied reservations.— (1) Howley v. Chaffee, 88 Vt. 468, 93 A. 120, L. R. A. 1915D, 1010. (2) And this distinction is well founded in principle and well supported by authority. Howley v. Chaffee, supra. (3) 'As a grantor cannot derogate from his own grant, while a grantee may take the language of the deed most strongly in his favor the law will imply an easement in favor of a grantee more readily than it will in favor of a grantor.' Wells v. Garbutt, 132 N. Y. 430, 435, 30 N. E. 978."

This distinction was recognized in Dabney v. Child, 95 Miss. 585, 48 So. 897, where this court quoted with approval from 11 Cyc. 1171, the following: "If the grantor intends to reserve any right over the tenement granted, it is his duty to reserve it expressly in the grant. To say that a grantor reserves to himself in entirety that which may be beneficial to him, but which may be most injurious to his grantee, is quite contrary to the principle upon which an implied grant depends, which is that a grantor shall not derogate from or render less effectual his grant, or render that which he has granted less beneficial to his grantee. Accordingly, where there is a grant of land, with full covenants of warranty, without express reservation of easements, the best-considered cases hold that there can be no reservation by implication, unless the easement is strictly one of necessity; for the operation of a plain grant, not pretended to be otherwise than in conformity with the contract between the

parties, ought not to be limited and cut down by the fiction of an implied reservation.''

Moreover, we presume no one will deny that a right to a grantor cannot arise by implication that would destroy his grant, and that is exactly what can and may result here if the appellants' claimed implied right exists. It is not definitely known whether this land contains oil and gas or not; what the lessor claims is the right to enter the land, drill wells therein, in order to ascertain whether it contains oil and gas, and, if it does, to remove it. In order to ascertain whether the land does contain oil and gas he may have to drill several wells, for it is well known that one may result in a ''dry hole,'' while another in reasonably close proximity thereto may disclose oil or gas. In order to drill one well only he must exclude the lessee from part of the land; and, if he has the right to drill one well, he has the right to drill as many as may be necessary to enable him to remove the oil and gas therefrom with reasonable dispatch. This might, and, if the land is of small area, would, result in the practical exclusion of the lessee from the land. Compare Moss v. Jourdan, 129 Miss. 598, 92 So. 689.

The decisions of this court dealing with the relative rights of the state and the lessee of sixteenth section lands, leased under the statute hereinbefore referred to, are not without value here. Those cases uniformly hold that the lessor has no right to enter the land and remove therefrom the timber growing thereon, although they further hold that the lessee has no right to cut and remove the timber thereon except for the purpose of putting the land in cultivation, and for certain other limited uses, such as for firewood, building fences, and the like.

Oil and gas are readily taking the place of wood for fuel, and, if the result thereof is that the lessee has the same right to use oil and gas that may be in the land for fuel as he has to use the timber on the land for that purpose, those cases are controlling here.

But they are not without value, even if it should be held that the lessee has no right to use the oil and gas in the land for any purpose. The limited right which the lessee has to use the timber growing on the land would have been fully protected in the cases heretofore submitted to the court, dealing with the relative rights of the lessor and the lessee to the timber, by permitting the lessor to cut and remove the timber, provided he left remaining on the land sufficient thereof for the purposes for which the lessee had the right to use it. But the court did not so hold; but, on the contrary, held that the lessor is without the right to cut and remove any of the timber, although the leases had many years thereafter to run.

The rule applied in Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 A. 597, 18 L. R. A. 702, 34 Am. St. Rep. 645, relied on by the appellants, did not involve the relative rights of the lessor and the lessee in oil and gas contained in the leased land. There the owner of the land conveyed the coal therein, with the right to enter upon the surface and appropriate so much thereof as might be necessary to remove the coal. Afterwards the owner leased the land for oil and gas purposes, and the lessees were preparing to drill wells through the coal, in order to reach the oil and gas that lay beneath it, when they were sought to be enjoined from so doing by the owners of the coal. The court held that the lessees of the oil and gas privileges had the right to drill the wells. The principle applied there was the familiar one that, where the owner of land granted a portion of it to another, leaving other land of the grantor to which he can have access only by passing through the land granted, the right so to do is reserved by necessity to the grantor by implication. In the language of Judge SANBORN in Kemmerer v. Midland Oil & Drilling Co. (C. C. A.), 229 F. 872, at page 886:

"It seems clear that there is nothing in these decisions or in the opinions in them in any way tending to over-

throw the long and firmly established principles sustained
and illustrated by the decisions and text-books to which
reference has been made, to the effect that neither a les-
sor nor his subsequent lessee can lawfully interfere with
and disturb the exclusive possession of a prior lessee for
years, without restriction, reservation, or exception, of
an entire tract of land. They go no farther than to sus-
tain the familiar principle that the sale and conveyance
by the owner of a tract of land, while he still owns it and
still has the right to the exclusive possession and use of
the surface of it, of the coal in it or of the oil and gas in
it, carries to the respective lessees, by implication, the
right, as against the lessor and against each other, to
such entry upon and use of the surface, and of the spaces
containing the coal and the oil and gas, as shall be rea-
sonably necessary to enable each of them to have access
to and to remove the mineral granted to them. They do
not hold that after an owner has sold and conveyed or
mortgaged, or leased for years, a tract of land without
restriction to any specific purpose, and without any res-
ervation, he or his subsequent lessees or grantees for
mining purposes, or for any other purposes, may law-
fully assail the title or disturb the possession of the prior
grantee, mortgagee, or lessee. They in no way challenge
or deny these indisputable propositions: While one is the
owner of a tract of land, he may separate it into different
strata, and grant the right to one stratum to one party,
and the right to another stratum to another party; but
when he has parted with all his right and title to all of
his tract he can no longer subdivide it, or grant any right
in it. While one is the owner of the exclusive right to the
possession of a tract of land, or even of the surface of it,
he may grant by express lease, or by implication by
means of mining leases, rights to the possession and use
of parts of the surface of his tract. But the whole of the
surface is greater than any of its parts and contains all of
them, and after he has granted and covenanted to one

by a lease for years the exclusive possession of the entire surface of a tract of land, or the exclusive possession of the entire tract, he cannot lawfully grant to another by express leases, or by implication by means of mining leases, or in any other way, any right to the possession of any part of the surface of that tract during the term of the lease.''

That case (Kemmerer v. Midland Oil & Drilling Co.) is the only case deciding the exact question here presented that has been called to our attention. The majority of the court there held that the lessor of land for a term of years, in the absence of a provision in the lease to the contrary, has the right to enter upon the land and drill for oil and gas that may be therein. The fallacy of this holding was demonstrated by Judge SANBORN in a dissenting opinion, wherein, among other things, he said:

''A lessee for years of a tract of land from the owner, without reservation, restriction, or exception, has the absolute right to the exclusive possession of every part of the surface and of every part of the land from the zenith to the nadir during the term of the lease. A stranger has no right to enter upon or in any way disturb the possession of such a lessee without his consent, and if he does so the lessee may maintain a suit against him for appropriate relief. Neither the lessor nor any one by his subsequent authority, grant, or lease, has any such right: (1) Because by the lessor's lease of the entire premises without exception or reservation he divests himself of all right to enter upon or to interfere in any way with the exclusive possession by the first lessee of every part of the surface of, and of every part of the entire, premises leased; and (2) because the law implies from his use of the word 'let,' or the word 'lease,' or any similar word in his lease, his covenant with the lessee that the latter shall enjoy the quiet possession of the entire premises leased, free from any interference with or disturbance of his exclusive possession of every part thereof, either by the

lessor or by any one claiming under him, and all subsequent lessees take subject to this covenant which runs with the land. So it is that a lessor and those claiming under him have much less appearance of right to enter upon and occupy any part of the leased premises, or to interfere with or disturb the exclusive possession of the first lessee, than an entire stranger, for they have no better right than such stranger, and he is not bound by any covenant of quiet enjoyment or subject thereto. And because the lessee in the case at bar first leased for years the entire tract of land here in question and every part, of it, and the lessee took possession of it under the lease before the lessor made the subsequent lease to the Midland Oil Company of the right to take and occupy the land for the purpose of prospecting for and removing oil and gas therefrom, my mind finds no way of escape which is to it either logical or reasonable from the conclusion that neither the lessor nor the subsequent lessee has any right whatever to enter upon or to occupy any part of the surface of the land first leased to Kemmerer, or any other part of that land, or to interfere with or disturb Kemmerer's exclusive possession thereof during the term of the lease.''

What we have above said is upon what in our opinion is the present state of the law, and what we must hold it to be, unless we are to resort to what, as we view it, would be judicial legislation. We express no opinion whether valid legislation might be enacted which would provide the right and the legal means and machinery whereby, upon notice to the tenant and a right to be heard, the court could prescribe a limited and reasonable portion of the leased premises upon which the landlord could drill a well for oil or gas, or make an entrance to a mine.

The equal division of the court on the question of error vel non in the decree of the court below results in the affirmance of that decree. Consequently, it will be affirmed, and, as the appeal was granted for the purpose of settl-

ing the controlling principles of the case, the cause will be remanded.

Affirmed and remanded.

**McGowen, J.**, delivered a dissenting opinion.

The case presented here is so far reaching in its effect, and so vitally affects the interest of the people of this state, that I feel constrained to dissent from the opinion rendered herein by Judges SMITH, GRIFFITH, and ETHRIDGE, and, therefore, set out my own views gleaned from the record.

The Gulf Refining Company of Louisiana, the United Production Corporation, and the Home Oil Producing Corporation exhibited their bill in equity for an injunction against Hinds county, as represented by its board of supervisors, and W. D. Terry.

It is alleged in the bill that on the 7th day of February, 1929, the board of supervisors of Hinds county entered into an oil and gas lease with John H. Ganzel, by which the county leased to Ganzel, his assignees, or sublessees, the right to mine or operate for oil and gas, wherein there was reserved to Hinds county one-eighth of all oil produced from said land and one-eighth of all gas utilized and sold off the premises, at a fixed sum per thousand cubic feet. It is further provided that a well should be commenced before February 7, 1931, and, in default thereof, the lease should terminate, unless the lessee should pay to the lessor an additional compensation as rental. The complainants, appellants here, also alleged that they had lawfully acquired all the rights granted under the original oil and gas lease contract as applied to the west half (W. ½) of the southwest quarter (S. W. ¼) of section 16, township 6 north, range 1 east.

It was further alleged that the conditions and provisions of the said oil and gas lease had been complied

with by the lessees and the compensation due thereon paid; that immediately after complainants made the location of their drilling site on said eighty acres of land, described above, and commenced drilling operations thereon under the terms of said oil and gas lease, the appellee, W. D. Terry, who was alleged to be the owner of a surface lease of the described tract of land, objected to complainants' operations, and halted such operations by force, and threats of violence and criminal proceedings, and otherwise impeded their efforts to drill a well on the premises; and that W. D. Terry was the owner of a ninety-nine year lease, having acquired same by mesne conveyances from the original lessee.

It was further alleged that, at the time of the execution of the surface lease contract to Terry's predecessor in title, the land was leased only for agricultural and pasturage purposes; that neither oil nor gas had been discovered in this state at that time, and that there was no authority of law for the execution of a mineral lease as to the sixteenth section school lands held in trust by the state for the school children thereof; that said lease did not, in fact, convey any interest in the minerals beneath the soil nor any interest in the oil and gas thereunder; that said Terry had no title whatever to the minerals or the oil and gas beneath the surface of the soil; and yet the assertions of claim by the appellee, Terry, while wholly unwarranted, are a cloud upon their title.

It was further alleged that the point at which they desired to drill the well on this tract of land was on a rural section some miles from the city of Jackson, and that it was used by Terry solely for agricultural purposes; that, in entering upon said lands for the purpose of drilling for oil and gas at the place of location of the well, it would only be necessary to travel across approximately six hundred feet of soil in going to and from said well, and to use a sufficient amount of land in drilling the well; that their pipes would be placed at a suf-

ficient depth under the surface to insure no interference with the plowing or other cultivation of the surface soil; that any interference with the surface of the soil by the the complainants in their operation would be minor both in the amount of land used and otherwise; and that complainants stand ready to repair any damage done to the surface of the soil by any of their drilling operations, and to see to it that operations are conducted in such a way as to make the defendant, Terry, secure in the full and free enjoyment of all of his rights to the surface soil.

It was further alleged in the bill that gas had been discovered in the city of Jackson, and that it was believed that the area in and around Jackson was good, prospective territory, and it was charged that, although the board of supervisors had entered into an oil and gas lease with their predecessor in title, Ganzel, they were now conspiring with the defendant, Terry, in order to prevent their succeeding in developing that territory for oil and gas in commercial quantities; and they prayed for an injunction against any interference on the part of the defendant, Terry, with their going upon the premises described and drilling a well and taking from beneath the surface of the soil oil and gas, if same should be discovered.

A temporary writ of injunction was granted by a judge of this court, and served upon the defendant, Terry.

Appellee, Terry, answered the bill of complaint, denying the equities of the bill, and asserted that, by reason of his ninety-nine-year lease, he had an interest in the oil and gas beneath the surface of the earth, which lease rendered any contract executed by the board of supervisors with the complainants null and void. The appellee, in effect, asserted that, by the terms of his lease contract, he was entitled to the exclusive and peaceable possession of the entire tract of land without interference therewith either by the board of supervisors or its grantees; that the lease contract under which complain-

ants claim was ineffectual to convey any title to them in the oil or gas as well as to convey any right to go upon his premises to erect a derrick and drill for oil or gas, or to maintain same on his land; that he had begun the cultivation of the land with a view to making a crop; and that the interference with his peaceable and exclusive possession of the same would be greatly to his damage.

Hinds county, through its board of supervisors, answered that the oil and gas lease executed to the complainants was void, and demonstrated a friendly and cooperative spirit toward Terry, the defendant in the suit.

At the same time of the filing of the answers to this bill, defendant, Terry, made a motion to dissolve the injunction. Some evidence was heard by the court, and an order was entered dissolving the temporary injunction theretofore granted and allowing an appeal to this court to settle the principles of the case.

Another issue was raised by the pleadings and evidence which was disposed of adversely to the defendant, Terry, and to which I shall not advert for the reason that counsel agree that the issue is not presented to us by this record.

The oil and gas lease executed by the board of supervisors, and under which the complainants, the appellants, make their claim to a right to go upon the lands and drill for oil and gas was to be terminated within two years if operations were not begun by the lessees, recited a valuable consideration paid, and also sold all the oil and gas discovered and produced to the lessees, reserving to itself a royalty therein, and continued in force so long as oil or gas should be produced in commercial quantities. If gas was discovered the complainants were to furnish free gas to the farm house.

The lease, denominated a surface lease by the complainants, was executed by the trustees of section 16, township 6, range 1 east, of Hinds county, to Terry's predecessor in title, Mosely, on the 16th day of Novem-

ber, 1846, the granting clause thereof being in these words: "Have sold, leased, remised and to farm let, the above described land, to the said Mosely, and his assigns, for and during the term of ninety-nine years, commencing and terminating as aforesaid," the date of termination being March 30, 1945.

Terry's lease was executed in pursuance of "An act to authorize the trustees of the school lands within each township in this state to lease the sixteenth sections within the same for ninety-nine years, and for other purposes," found in the Laws of Mississippi 1833, at page 452, wherein, under certain conditions, the trustees of said school lands were authorized to "lease" sixteenth sections of township lands to individuals for the benefit of the schools. Prior to 1833, the legislature had authorized said school township sixteenth section lands to be leased for a shorter term than ninety-nine years.

Tersely stated, the facts are: Terry, the defendant, by mesne conveyances, acquired his right to possession of the land in question by a farm lease executed by the constituted authority who held the land in trust in 1846, and subsequently thereto, in 1929, the board of supervisors executed an oil and gas lease, to which I have referred, in favor of the complainants. The complainants now contend as the owner of the oil and gas lease that they are, by virtue thereof, empowered to go upon the leased premises held by Terry, without his consent, and explore for oil or gas, to which, if discovered, they have title from the owner; that the state of Mississippi and the county of Hinds never parted with the title to the oil or gas beneath the surface of the soil until they acquired same; and that Terry, by his lease, never acquired any right to, interest in, or title whatever to, the oil or gas, nor did he acquire the right to drill therefor by his farm lease surface contract.

It is further asserted by the complainants that the legislature reserved the right to the oil and gas in the

state until 1926, when it passed chapter 318 of the laws thereof, now appearing as sections 6762 and 6763 of the Code of 1930, by which act, for the first time, boards of supervisors subsequently authorized to act as trustees in lieu of the trustees of sixteenth section lands, were authorized and empowered, in their discretion, to enter into contracts, with the approval of the attorney-general and the governor, for the leasing of sixteenth section lands, reserved for the support of township schools, for oil, gas, and mineral exploration and development, and which act empowered the lessee to enter upon the premises leased for that purpose, and do all things reasonably necessary or expedient for the production and preservation of any of such products.

The defendant, Terry, sharply presents to this court as the main question in the case: May the owner of a tract of land, who has leased it for a term of years, without any reservation, exception, or restriction, to a lessee, who has gone into possession thereof under a written lease, vest in a second lessee, by lease subsequently entered into in point of time, the right to take oil or gas from beneath the surface of the land, or by any such subsequent lease grant to such subsequent lessee the right to deprive the first lessee of the exclusive and unrestricted possession of each and every part of the surface of land demised, and all that portion appropriated to him during the term of his prior lease?

The defendant, Terry, further asserts that, because of the timber decisions rendered by this court, which constitute a rule of property, he is entitled to the same kind of interest in the oil or gas produced, and that same cannot be appropriated by the owner or its lessees without his consent. It is quite true that, in the original lease to Mosely by the school trustees, there was no kind of express reservation or exception. It was a complete lease carrying with it what the word "lease" imports, no more, no less. It is equally true that by the second lease of the

right to explore for oil or gas, executed by the board of supervisors to Ganzel, in pursuance of the laws of 1926, supra, the legislature asserted the right of the state to go upon the sixteenth·section lands which it had theretofore leased, and assumed to authorize the conveyance of that by this legislative enactment or declaration.

There was a time in the history of the jurisprudence of this state when distinguished judges asserted that by virtue of a lease for ninety-nine years, substantially the same in import to the one here under consideration, such lease conveyed an estate of higher dignity in the land than one for a short term; but that view did not become a part of the law of this state. In the case of Warren County v. Gans et al., 80 Miss. 76, 31 So. 539, where timber on sixteenth section land was involved, it was finally and definitely determined that under these ninety-nine year leases the tenant for so many years was liable for waste as to timber growing thereon, holding that a tenant for years who cuts standing timber for sale, and not for necessary estovers, nor for clearing so much of the estate for cultivation as a prudent owner in fee would do, is guilty of waste.

In the case of Dillingham v. Jenkins, 7 Smedes & M. 479, this court held that a lease of ninety-nine years is of no higher dignity than a lease for the term of one year. In the case of Moss Point Lumber Co. v. Harrison County, 89 Miss. 448, 42 So. 290, 873, this court finally held that a conveyance by the board of supervisors of sixteenth section school land, authorized by the statute for a term of ninety-nine years, is, under the statute, a mere lease, the estate conveyed a leasehold, governed by the principles applicable to estates for years, and does not grant an interest in the fee; and that the act of 1833, supra, did not affect the tenant's liability for waste, and that the cutting of timber for commercial purposes by a tenant for years is waste. The court further held that a lessee of sixteenth section school land is presumed, in

the absence of a stipulation in the lease to the contrary, to have taken the land for agricultural purposes and only with such rights as go with a lease of lands; and that the subsequent assignee has the same right and assumes the same liability as the original tenant, in other words, it was held as regards these sixteenth section school lands, as between a representative of the state and the lessee or his assignees, the relation is that of landlord and tenant. It is clear from our own decisions, without mentioning all of them, that in this state the tenant may clear these lands for agricultural purposes, or so much as would promote good husbandry, and, in doing so, he may utilize the timber growing thereon, and may use such timber so far as good husbandry would require for estovers; that is, wood for repairing fences in connection therewith, and doing those things necessary to keep the place in repair for the agricultural purposes for which it was leased; and that the state could not convey the timber without the consent of the tenant. See Moss Point Lumber Co. v. Harrison County, 89 Miss. 448, 42 So. 290, 873; Dantzler Lumber Co. v. State, 97 Miss. 355, 53 So. 1; State v. Blodgett, 110 Miss. 768, 70 So. 710; Fernwood Lumber Co. v. Rowley, 110 Miss. 821, 71 So. 3.

A review of the authorities dealing with the timber on these lands discloses clearly that this court has settled beyond peradventure that a tenant who has acquired no interest whatever in the fee, but has acquired all the rights of a tenant lawfully in possession, is entitled to the quiet and peaceable enjoyment of the leasehold premises; and that right is exclusive as against the landlord, as well as against every other person in the world, unless it be clear from the terms of the lease and the dealings of the parties that there is an implied reservation in the owner of that stratum of the land which lies beneath the surface in which may be minerals, or gas or oil.

In the case of Moss v. Jourdan, 129 Miss. 598, 92 So. 689, it was held that, where one person owns the surface

of land and another the mineral therein, the owner of mineral may remove it from the land, but in so doing he must allow sufficient of the subjacent land to remain to support the surface in its natural state, in which case, it will be observed, that there was an express reservation of the minerals beneath the soil. The case is valuable, however, for the establishment of the doctrine that the owner of land may divide it horizontally, and distinguish the surface from the subjacent lands, in other words, the surface may be distinguished from the coal immediately beneath the surface, from the minerals extending further beneath the surface, and from the oil and gas stratum which lies usually still further beneath the surface. This court has held that the deposits under the surface of the land are susceptible of separate ownership as distinguished from the ownership of the surface of the land, and that such separate interest may be conveyed separately from all other interest, and that the tenants in common thereof may have partition proceedings separate and apart from the balance of the estate in the lands. Stern v. Great Southern Land Co., 148 Miss. 649, 114 So. 739.

In the case of Stokely v. State, 149 Miss. 435, 115 So. 563, this court held, in passing upon a lease contract similar to the one in the case at bar, that the trustees of the state insane hospital had no power to enter into such a lease contract, whereby an interest in the oil and gas was conveyed, and that the instrument was, in legal effect, a lease of the land and a conveyance of an interest therein.

This court is further committed to the doctrine that oil and gas in place in the soil are minerals forming a part of the soil belonging to the owner thereof, and subject to sale by the owner before they are removed and reduced to possession as personalty, like coal or iron; and this is true, although the adjoining owner may, by the

establishment of an offset well, withdraw the oil or gas because of its fugacious nature.

Although section 211 of the Constitution prohibits the sale of these sixteenth section lands, yet this court is committed to the doctrine that the sale of the timber growing on the land is not within the prohibition of said section of the Constitution, and that the word "land," as used in that section, was in its restricted sense, meaning not the soil including everything above and below it, but simply the soil itself. See Dantzler Lumber Co. v. State, 97 Miss. 355, 53 So. 1. Neither the state nor the lessee comprehended that oil and gas would be developed in this state in close proximity to the land here in controversy. It was then not in contemplation of the parties that the fugitive gas and oil in a stratum of earth unfit and not possible to be utilized for agricultural purposes was intended to be conveyed. There is no reason why the word "land" should be used in a restricted sense with reference to timber, and in its broad, common-law definition when applied to oil and gas. In the broad sense growing timber on land is a part of the realty, but in the sense referred to, relative to its sale prohibited by section 211 of the Constitution of 1890, it is not land, and its sale is not prohibited thereby. How much stronger the argument that a lease of the lands described here did not include the fugitive oil or gas in the subjacent lands!

As to fugitive oil or gas beneath the surface of the land, the rule quoted above, as announced in Dantzler Lumber Co. v. State, 97 Miss. 355, 53 So. 1, applies with still more reason and with greater force. The trees growing upon the land are perceptible to the eye, and might be admeasured at a glance as an integral part thereof necessary to the enjoyment of the lease, but not so with oil or gas which flows through rocks and certain sands seeking a vent, and, if perchance penetration is made of the earth to the stratum in which it is located, the gas or oil, because of its volatile character, will seek its way

out flowing to the surface, the owner of the land owns from the zenith to the nadir, and, as we have stated before, our court is committed to the well-established doctrine that the owner of land may divide it into as many convenient, separate strata of earth as exist. Therefore I am of opinion that there was no prohibition by section 211 of the division here made by the legislature, as evidenced by the Laws of 1926.

I am persuaded that a tenant for a term has no higher degree of right than is vested in a tenant for life. It has long been the law, and seems to be uncontroverted, that, with reference to coal mines, it is settled that a life tenant has no interest in and no right to open and work unopened mines. The life tenant may continue to work and operate those mines which are in operation at the time he is vested with the estate, but, if he undertakes to open a new mine, he is guilty of waste, and equity will enjoin him from its commission. See Bond v. Godsey, 99 Va. 564, 39 S. E. 216; Richmond Natural Gas Co. v. Davenport, 37 Ind. App. 25, 76 N. E. 525; Gaines v. Green Pond Iron Mineral Co., 32 N. J. Eq. 86; Marshall v. Mellon, 179 Pa. 371, 36 A. 201, 35 L. R. A. 816, 57 Am. St. Rep. 601. The reason why tenants for life, as a general rule, cannot open and operate new mines is because it would be a lasting injury to the inheritance. Eley's Appeal, 103 Pa. 300.

By the same rule it is evident that the state still owns the oil and gas, and the question sharply presented for us to decide is whether or not the state, through its selected representatives, having executed a farm lease to Mosely, the defendant's (Terry's) predecessor in title, in 1846, to the surface of the land for agricultural purposes, is now cut off from entering upon the surface of the land in a reasonable manner to drill a well by which it may withdraw its property from the bowels of the earth. If the state did not convey its oil or gas by its lease of 1846, still in force, then the state is still the owner of it and may dispose of it by virtue of the laws of 1926,

and, having so disposed of it, the lessee thereof has the same right as the original owner had to take possession of this now thought to be valuable property. Can it be that, having retained the coal, iron, gold, silver, and oil and gas, and not having disposed of it, by virtue of this farm lease, the owner is now so separated from his own property as not to be able to gain possession of it? At the most, the complainants in the court below sought to take this property beneath the soil in possession by going upon a very small, inconsequential portion of the property of the surface lessee, Terry, and for a time appropriating it, while the process of bringing into captivity the fugitive oil or gas was in operation. It is estimated, at the most, that only something like an acre and a half of land for a short time would be appropriated by the complainants in this behalf, and the quiet and peaceable enjoyment of the entire property of the lessee, Terry, would only be interfered with to the extent of the diameter of a small hole in the ground, the well, reaching from the surface of the land downward about two thousand five hundred feet. It cannot be gainsaid that oil and gas are very valuable to humanity, that the use of these minerals is one common to almost every manufacturing enterprise, that its use promotes the health and prosperity of the people of the country, furnishes heat for both the rich and poor, and power to turn the wheels of commerce—in general, makes the land a better place in which to live. The record discloses that many wells are being drilled on every hand; and it is a well-known fact that an adjacent landowner may not only take the oil and gas from beneath the boundaries of his own land, but that, once a vent is furnished, the oil and gas belonging to the state will be as completely wasted, so far as the owner is concerned, as if the tenant were permitted to waste it by withdrawing it from the ground and selling it for his own use and profit.

The state never sold to Terry the gas and oil or the right to explore for it; the state never granted authority 'for such sale until 1926; therefore the right of the state to it was reserved by clear implication.

I am therefore of the opinion that the owner in this case reserved the mineral rights, including oil and gas, and did not convey the stratum so far beneath the surface of the land as to be useless for purposes of agriculture, and that the tenant, Terry, had only a lease of the surface lands in sufficient depth to be used for agricultural purposes. As compared to the minerals beneath the surface of the land, this small amount of land to be taken by the owner, for a short period of time, is insignificant in value when it is compared with the enormous source of wealth that has been developed from beneath the surface of the soil. Lands that brought but little revenue comparatively when put to agricultural uses, we know, are enhanced to a great degree when there is found beneath their surface soils, hard minerals, or oil or gas. Many states of this Union have become possessed of the wealth of Midas because of this discovery and the triumph of science in being able to marshal and use profitably these valuable subterranean forces. No substantial, permanent injury would come to the tenant holding the surface farm lease, while the probabilities are that a great and substantial loss would accrue to the owner of the soil, or his assigns, if deprived of the right to impound or imprison these valuable substances which are sought to be taken by the complainants in this case, who have the rights, interest, and privileges of the owner. The right to gas and oil having been reserved; the implied right to go upon the land in a reasonable manner for the purpose of reducing to possession its reserved property just as clearly must be implied.

In this view I am amply sustained by the decisions of other courts where these questions have arisen and been settled. The first case to which we have recourse is Rend

v. Venture Oil Co. (C. C.), 48 F. 248, wherein a temporary injunction was sought by the owner of a coal mine to restrain the sinking of an oil and gas well through it where at the particular place the well was being sunk the coal had been mined, except sufficient of it to furnish the necessary support to the surface above. In that case, it was assumed that the defendant had an implied right to go through the coal mine, or, at least, the burden was upon the coal mine owner to show that there would be danger of an explosion or ignition in the coal mine from the escaping gas. The right of the owner of the oil and gas to penetrate the coal strata in order to reach the oil and gas beneath was upheld.

The most interesting case I have noted is that of Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 A. 597, 18 L. R. A. 702, 34 Am. St. Rep. 645, in which case the court unanimously agreed that, where the owner of an entire tract leased or sold the coal beneath his tract, without any reservation of a right of way through the coal to explore for oil or gas or anything else, and when it was unlikely that either the owner of the surface or his vendee of the coal knew of the existence of oil or gas beneath the coal, and subsequently the owner of the surface leased the oil and gas privilege to a third person, who commenced to bore from the surface down through the coal in search of oil and gas, the right of access to the oil and gas existed always, and that the owner of the coal was not entitled to an injunction against his thus utilizing that portion of the land occupied by the coal vein. That case was immediately followed by the case of Mansfield Coal & Coke Co. v. Mellon, 152 Pa. 286, 25 A. 601. The case of Kemmerer v. Midland Oil & Drilling Co. (C. C. A.), 229 F. 872, is squarely in point, adopts and approves the Chartiers case, supra; and in the main opinion may be found the rule herein announced, while in Judge SANBORN's dissent therein is a complete analysis and résumé of the opposing view. This case fully upholds

the view I entertain, and the views expressed by the majority opinion in the case at bar were there fully considered and are to be found in the dissenting opinion of Judge SANBORN. The case of Magnolia Petroleum Co. v. Price, 86 Okl. 105, 206 P. 1033, while not squarely in point, is persuasive of the same rule. The authorities generally are in accord herewith that, where there is an express reservation of the minerals and oil and gas, the owner has the implied right to go upon the surface in a reasonable manner where he does no permanent and·irreparable injury to the prior surface land lessee in his lease and in his right thereto, although no authority to so enter was originally reserved. Also see the cases of Fawn Lake Ranch Co. v. Cumbow, 102 Neb. 288, 167 N. W. 75; Briggs v. Neville, 103 Neb. 1, 170 N. W. 188; 4 Thornton, Oil & Gas, vol. 2, par. 886; 27 Cyc. 629, 630, which show the trend of decisions toward the rule I here invoke.

6 Thompson on Real Property, sec. 5136, thus states the situation: ''The courts have experienced much difficulty in applying the law so as to give the surface owner and the owner of an underlying strata the right to enjoy their respective estates without infringing upon each other's rights, especially where the owner of the surface has neglected to define the rights of each in the deed by which he granted the lower strata to another. As against the surface owner, the owner of the minerals has a right, without any express words of grant for that purpose, to go upon the surface to drill wells to his underlying estate, and to occupy so much of the surface beyond the limits of his well or wells as may be necessary to operate his estate and to remove the product thereof. This is a right to be exercised with due regard to the rights of the owner of the surface, but subject to this limitation, it is a right growing out of the contract of sale, the position of the stratum sold, and the impossibility of reaching it in any other manner. In a grant of land, an exception of the oil

and gas and the right to go upon the land for the purpose of operating for same, is not defeated by covenants for quiet enjoyment and freedom from encumbrances thereon. Such covenants relate only to the property granted. That property is the land without the oil and gas. It is the land burdened with the right of the grantor to get the oil and gas retained.''

In the case at bar there was no power vested in the representatives of the state to convey the oil and gas until the legislature passed the act of 1926.

Counsel for appellee's only argument against the rule here invoked is that there is no express reservation by the state and its representatives of the right to gas and oil. Since I have concluded that there was no grant of this right to Terry, the defendant, it follows logically, and naturally, that the right was so retained by the state, and that, having reserved to itself possession of its valuable lands beneath the surface of the earth, it then follows that there is an implied reservation to go upon the surface of the land in a reasonable manner for the purpose of sinking a well, and thereby withdrawing from beneath the surface its valuable property, which can be accomplished in no other way; and it is the only way to secure its property and prevent such from going into the hands of strangers, due to the fugitive nature of the products desired to be conserved, to which I have adverted.

There is no assertion of his right of estovers or bote in the oil or gas in place in the subjacent lands here presented to us. However, I have been unable to find a case allowing such right to a tenant for a term of years in the case of coal mined from the subjacent lands. There is a very broad distinction between timber growing on the land and oil and gas beneath the surface.

Of course, such damage as may accrue to the lessee of the surface in his crops and in depriving him of the use of that small portion of the land must be compensated

for by the owner, or its grantees, so seeking to explore for gas and oil. Unreasonable entries, of course, will not be permitted or tolerated by the courts of this land, no more than an unreasonable refusal of the right to enter such land will be tolerated when asserted by the tenant. The equity court has ample power to see that no unusual or abnormal injury is done the owner of the surface lease. His right may be fully protected, and the amount of damage accruing to him may be easily and readily ascertained, and the rights of all thus accomplished. To hold otherwise would mean that the state and the school children would be deprived of this property, that the tenant could accomplish the waste of it by virtue of his farm lease, and that strangers might be allowed to dissipate the entire, valuable estate by the sinking of wells adjacent to, and offsetting sixteenth section land, held in trust for the school children of the state. I might add that nothing unreasonable is shown by the bill and evidence in this case in the manner of entry upon these lands. The law is a growth and must advance with changing and improving business and social conditions.

I conclude that the state never parted with its right to the possession of the oil and/or gas in place in the subjacent lands, and that same was reserved, and with that implied reservation of the oil and gas was certainly the implied right or reservation to reasonably go upon the lands and remove therefrom its valuable property. As this right vests in the state, it is a right which it can convey if the legislature so wills.

With the views I have expressed here it is idle to say that anything therein intimates that the landlord, having executed such a lease as is involved here of the surface, would be permitted by a court of equity to substantially or materially destroy Terry's right to and interest in the freehold. No such thing could be done, or is in contemplation, or has been permitted by the courts which

have adopted the rule which I believe to be in the interest of landlords and tenants, of the people of the state, and of the school children yet to be born. I therefore think the motion to dissolve the injunction should be overruled, and the case remanded in order that the chancery court might protect the appellee, Terry, in the enjoyment of his estate and from any unfair, unwarranted, unreasonable destruction of his right, and also enforce the right of the appellants as herein outlined.

Cook and Anderson, JJ., join in this dissent.