469 So.2d 516 (1985)
FOURTH DAVIS ISLAND LAND COMPANY, et al.
v.
Earnest B. PARKER and Bobby Earl Parker.
No. 54506.
Supreme Court of Mississippi.
January 16, 1985.
As Modified on Denial of Rehearing May 22, 1985.
*517 Robert R. Bailess, Wheeless, Beanland, Shappley & Bailess, Vicksburg, Frank E. Everett, Jr., Brunini, Grantham, Grower & Hewes, Jackson, for appellants.
Lee Davis Thames, Luther T. Munford, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, for appellees.
Before ROY NOBLE LEE, P.J., and HAWKINS and SULLIVAN, JJ.
SULLIVAN, Justice, for the Court:

I.
This appeal involves the relative rights of two landowners to a private power line that originates in Louisiana, crosses Palmyra Lake, a former bed of the Mississippi River, and stretches across two tracts of land owned by the parties on Davis Island, a remote part of Warren County, Mississippi, on the Louisiana side of the Mississippi River.[1] Fourth Davis Island Land Co. (Fourth Davis) owns the tract where the power line terminates, which is used as a private hunting reserve. Ernest and Bobby Parker, farmers and cattlemen, own the intervening land across which the power line stretches to reach the Fourth Davis tract.
The Chancery Court of Warren County denied Fourth Davis' request for an injunction to prohibit the Parkers from interfering with Fourth Davis' maintenance of the power line on the Parker property and its plans to string a second power line on the poles across the Parker property in order to separate the electrical service. The chancellor ruled that Fourth Davis was not entitled to an implied easement where the power line crosses the Parker property, but held that Fourth Davis had the right to receive electricity through the power line, when available. The chancellor awarded Fourth Davis a judgment of $2,826.05, representing the sum the Parkers owed Fourth Davis for electricity, minus the sum Fourth Davis owed the Parkers in maintenance and repair costs.
Fourth Davis appeals the chancellor's refusal to judicially imply the grant of an easement where the power line crosses the Parker land. The Parkers appeal the chancellor's ruling that Fourth Davis has a right to receive electricity through the power line and the award of money damages.

II.

A. Background
In 1961, when the power line at issue was built, R. Lee Parker, Jr. owned as one *518 tract what are now the Fourth Davis and Parker lands. His sons, Ernest and R. Lee, III, constructed the power line in two stages, first to the present Parker dwelling, then to a hunting camp located at the present Fourth Davis complex. In 1963, R. Lee Parker, Jr. died, leaving to each son an undivided one-half interest in the property, which they continued to manage jointly. In 1965, R. Lee Parker, III, died, leaving his undivided 1/2 interest to his wife, Mrs. Winnie Kelly Parker and daughter, Mrs. Patsy Parker Reaver.
In March, 1966, the co-tenants executed a partition deed whereby Ernest Parker received tract 1 (northwest portion) and Mrs. Parker and Mrs. Reaver received tract 2 (southeast portion). The deed granted a right-of-way easement to both parties to a road which loops through both tracts. The deed contains the following reciprocal clause:
There is further transferred, conveyed, assigned and delivered unto the said Ernest B. Parker by the said Mrs. Winnie Kelly Parker and the said Mrs. Patsy Parker Reaver all rights and causes of action that do now exist, or that may have heretofore accrued in favor of the said Winnie Kelly Parker or the said Patsy Parker Reaver, which grew out of, or did come into existence as a result of, the ownership of their undivided interest or the interest of their predecessors in title, in the aforesaid land northwest of the said division land.
The deed contains no reference to the power line running through what was now two separate tracts of land.
In October, 1966, C & S Cattle Co. entered into an agricultural and grazing lease with the owners of tracts 1 and 2. Under the lease, C & S Cattle agreed to pay all utility bills including electricity used by the lessors. C & S Cattle Co. exercised an option to extend the lease until the end of 1976.
In October, 1971, Mrs. Winnie Parker and Mrs. Reaver sold and conveyed tract 2 to Fourth Davis for one million dollars. The deed conveyed title to the property together with all rights, servitudes, and rights-of-way which Mrs. Parker and Mrs. Reaver acquired or retained under the 1966 partition deed. The 1971 deed expressly included as part of the freehold all timber, buildings, and power lines on the land conveyed thereby.
In March, 1972, Fourth Davis terminated through negotiations the agricultural and grazing lease held by C & S Cattle as to tract 2. Fourth Davis agreed to assume C & S Cattle's obligation to pay for electricity through 1976 as part consideration for cancelling the lease. Fourth Davis has continued to pay for all electricity, including power consumed by the Parkers, since the expiration of the lease.

B. Negotiations
In 1974, Ernest Parker proposed to extend permission to Fourth Davis to maintain and operate the power line across his land upon certain conditions. Fourth Davis agreed to maintain an insurance policy indemnifying Parker for any property damage or personal injury resulting from the presence of the line or Fourth Davis' maintenance of the line. Fourth Davis refused to agree that its authority to maintain the line would expire at the end of 1976, whereupon renewal of permission would be renegotiated. Therefore, no agreement was concluded.
In 1978, Parker warned Fourth Davis that it did not have his permission to gain access to the power line on his property. Fourth Davis refused to recognize Parker's claim as absolute owner of the power line. Parker offered to permit Fourth Davis to receive electricity through the line on the condition that he be furnished free electricity and retain exclusive right of maintenance across his property. Fourth Davis rejected this offer.
In 1979, Fourth Davis informed the Parkers that it intended to enter their property to string a second line along the existing poles and add a separate meter. Ernest Parker responded that Fourth Davis had no permission to enter his property to repair or modify the power line. Fourth Davis *519 then filed this suit for injunction requiring the court to determine the legal rights of the parties in a situation that could have been resolved by the exercise of a moderate amount of self-restraint and neighborly cooperation from both sides.

C. Trial
Fourth Davis claimed at trial that its predecessor in interest was impliedly granted an easement across the Parker land to maintain and repair the power line. The Parkers denied that the power line was necessary for enjoyment of the Fourth Davis property, that Fourth Davis had any right to maintain the power line on the Parkers' property, and that any improvement or separation of the power line was necessary. The evidence at trial focused upon (1) necessity, (2) maintenance, and (3) need for another power line, and (4) expenses.

1. Necessity
At the present Fourth Davis encampment, consisting of a dozen buildings including mobile homes and a large meeting shed, electricity is used for water pumps, lights, heat, air conditioning, and other appliances. Fourth Davis asserted that continuous electrical power is necessary to run water pumps for fire extinguishing and other safety purposes. Members of Fourth Davis testified that electricity through the power line was necessary to enjoy the camp in order to provide water, lights, and refrigeration of perishables. Cooking is partly achieved by butane and wood power. When Fourth Davis purchased the property, the power line fed a disused gin and a house trailer used as a hunting camp.
Ernest Parker testified that, prior to 1961, generators supplied his power on Davis Island. The power line supplied a maintenance shop, a temporary residence, and some water pumps for cattle. He said that having the power line helped to enjoy the property some. His son Bobby said that they used to rely upon generators to power water pumps for the cattle so that in his opinion the power line is not a necessity even now for his cattle operation. He admitted that the power line supplies a number of appliances at his dwellings, but said that he also uses butane ice boxes and butane or wood heaters.
Other landowners on Davis Island rely on generators for electricity. The Biedenharn hunting camp has a swimming pool whose water pumps are run by a generator. The Anderson-Tully hunting camp is powered by generators.

2. Maintenance
When R. Lee Parker, III died, his wife and daughter left to Ernest and Bobby Parker the duty to maintain the entire power line. They clipped the right of way, cleared back limbs, and replaced or repaired fuses, wires and poles.
After Fourth Davis bought tract 2, some of its members began to enter tract 1 to perform maintenance, including, but not limited to, replacing fuses. In reaching the power line, they left damaging ruts through the Parkers' pastures and crops. Fourth Davis performed more substantial repairs after the power line was damaged by severe weather, including a tornado. Fourth Davis notified the Parkers of their failure to repair the line several weeks after the tornado and proceeded to repair the line itself. Another time, Fourth Davis, with the Parkers' knowledge, used a bulldozer to clear underbrush and limbs from the Parker right-of-way to reduce outages.
Bobby Parker said that Fourth Davis' repair of the line following the tornado not only bypassed the Parker dwelling, it left a spliced hot wire within arm's reach from the ground. He stated that when the power goes out, he switches off the fuse and then checks the line and splices any broken wires. His fear that someone would replace a fuse while he was splicing a wire was corroborated by Ernest Dees, a consulting engineer, who stated that it is extremely dangerous for two separate persons to maintain the same stretch of power line. He said:
One person has to have control of line segments and in utility companies this is spelled out who has control up to this *520 point, and so forth, because in the event that there was some trouble on the line the person that was  thought he was responsible for working on it and another party came and closed the fuse it would probably kill him.

3. Second Line
D.F. Burkhalter, an engineer testifying for Fourth Davis, stated that the only way to accurately separate power consumption between the parties would be for Fourth Davis to add a second power line and a separate meter. He said that no changes to the existing poles or right of way would be necessary.
Pace, testifying for the Parkers, stated that Louisiana Power & Light refused to increase the amperage available for the power line beyond 25 amps. At present, the system can be coordinated to allow Fourth Davis 15 amps, but, under Fourth Davis' proposal, Dees stated that both parties' usage would have to be limited to 10 amps each, if both lines were to be equally fused. Dees stated that if an additional line were strung, both the poles and the right of way would have to be enlarged to meet national safety standards. Finally, Dees said that adding a second hot line to the poles would make maintenance more dangerous and that both lines would have to be shut off to safely work on either line.

4. Expenses
From 1977 to 1981, Fourth Davis paid a total of $34,420 to L.P. & L. for electricity consumed on Davis Island. The approximate percentages of usage based upon meter readings by Fourth Davis were 30% by the Parkers and 70% by Fourth Davis. Fourth Davis also paid $600 to have power poles replaced after the tornado and $371 to repair a fallen power line crossing Palmyra Lake.
Bobby Parker estimated his monthly maintenance costs on the right of way at $300, based on personal diary entries of repairs and maintenance since 1976. His total maintenance at the time of trial was $15,000.

III.

A.

DID THE CHANCELLOR ERR IN FINDING THAT FOURTH DAVIS HAD NO IMPLIED POWER LINE EASEMENT ACROSS THE PARKER LAND?
Fourth Davis asserts that the reasoning supporting the chancellor's conclusion was flawed in several respects. We consider each argument below.

1.
Fourth Davis contends that the chancellor erred as a matter of law in requiring that strict necessity be shown in order to create an implied easement. The chancellor relied upon Bonelli Brothers v. Blakemore, 66 Miss. 136, 5 So. 228 (1888), for the proposition that an implied easement can only be created if it is strictly necessary for the enjoyment of the property. A close reading of Bonelli reveals that the Court distinguished between ways of necessity, which require strict necessity for their creation and implied easements of things not strictly necessary, but highly convenient or essential to the full enjoyment of the land. 66 Miss. at 143, 5 So. at 230. The Bonelli Court states the principle governing ways of necessity thus:
If one sells to another a tract of land surrounded by other lands of the grantor, a right-of-way across such other land is a necessity to the enjoyment of the land granted and is implied from the grant made.
Id. The Bonelli case dealt with one store owner's effort to establish its right to use a rear alley that the adjacent store owner had blocked. The Bonelli Court adopted the general rule that "an easement not of strict necessity does not pass by implied grant, unless it be apparently permanent, obvious, and continuous." 66 Miss. at 143, 5 So. at 230. The Court having found that the interior store owner's use of the alley was neither a way of necessity nor continuous, the implied easement was denied. 66 Miss. at 144, 5 So. at 231.
*521 The strict necessity in Bonelli refers to creation of private rights of way that provide the sole access to landlocked property. The Bonelli court's recognition that there may be implied grants of things not strictly necessary but highly convenient demonstrates that when the easement is not in the form of a way of necessity, strict necessity is not required. It is thus possible to distinguish between the cases involving ways of necessity, wherein the implied easement provides the only means of access to the land, see Pleas v. Thomas, 75 Miss. 495, 22 So. 820 (1897); Warwick v. Pearl River Valley Water Supply District, 246 So.2d 525 (Miss. 1971); and Medina v. State ex rel Summer, 354 So.2d 779 (Miss. 1978), and cases where the implied easement is highly convenient or essential to the full enjoyment of the land. See Shipman v. Lovelace, 214 Miss. 241, 58 So.2d 657 (1952) (sewerage line easement granted); Hutcheson v. Sumrall, 220 Miss. 834, 72 So.2d 225 (1954) (water pipe easement granted). Since the easement sought by Fourth Davis is not a way of necessity, it follows that the chancellor should not have held Fourth Davis to the burden of proving strict necessity but instead reasonable necessity.

2.
Fourth Davis urges that the chancellor failed to apply the rule that where severance of title is accomplished by partition a presumption arises that each heir takes his portion of the property subject to such apparent, permanent, and reasonably necessary quasi easements which existed at the time of the ancestor's death. 28 C.J.S. Easements, § 32, pp. 690-91. Fourth Davis relies on 28 C.J.S. Easements, § 33, pp. 692-93, which states:
The weight of authority sustains a rule less exacting than that of strict and indispensable necessity, namely, that the degree of necessity is such merely as renders the easement necessary for the convenient and comfortable enjoyment of the property as it existed when the severance was made. The test of necessity is whether a party claiming the right can, through reasonable costs, create a substitute in his own estate.
Despite Fourth Davis's reliance upon this statement of the law, it rejects as irrelevant the availability of a substitute at reasonable cost. It contends that the focus should be on what was in place at the time of partition, whether the parties contemplated that it would continue, and whether it contributes to the convenient enjoyment of the property. We conclude that, although Fourth Davis correctly maintains that the reasonable necessity test governs this case, the necessity should be judged by whether an alternative would involve disproportionate expense and inconvenience, or whether a substitute can be furnished by reasonable labor or expense. 28 C.J.S. Easements, § 33, p. 693, 25 Am.Jur.2d Easements and Licenses, § 33, p. 446-47.
Applying this test to the facts of this case, we conclude that the power line is not reasonably necessary for the convenient enjoyment of Fourth Davis' property. There was uncontradicted testimony that at least two other land owners on Davis Island used gasoline generators to supply electrical power to their dwellings and water pumps.
Members of Fourth Davis admitted that cooking was achieved in part by butane and wood-powered sources. Also the Parkers testified that they used butane refrigerators and heating units on their property prior to and after the installation of the power line. Finally, no one resides permanently at either the Parker or Fourth Davis dwellings.
We are not holding that electricity is not a necessity, but that the means by which it is furnished to the Fourth Davis property is one for which a substitute could be furnished by reasonable labor and expense. Indeed, the amount expended by Fourth Davis on electrical bills would be adequate to purchase electrical generators to substitute for the power line. Thus, the presumption that the predecessors in interest of Fourth Davis were impliedly granted a power line easement does not arise because, *522 as measured by Fourth Davis' own authorities, the power line was not reasonably necessary since an alternative would not involve disproportionate expense and inconvenience.

3.
Fourth Davis contends that the chancellor's consideration of the possible unavailability of electrical power was an improper criterion in determining the existence of the easement. The chancellor relied in part upon the fact that L P & L had no obligation to furnish electrical power to Mississippi and the lands in Louisiana over which the power line crossed were not subject to his jurisdiction to conclude that the grant of an implied easement in this case could be a futile act. Fourth Davis urges that in Hutcheson v. Sumrall, 220 Miss. 834, 72 So.2d 225, (1954), this Court granted an implied easement for water supply even though it was acknowledged that water might not always be available. The Court stated:
If the supply decreases to such an extent that it will fulfill their bona fide needs only, then obviously others cannot expect to receive water. But, as long as the supply exceeds the bona fide needs of the appellees and J.W. Johnson, the appellants are entitled to share the excess for their bona fide needs.
Id. at 844, 72 So.2d at 229. Fourth Davis also points out that the power line has supplied electricity to the Parkers and to Fourth Davis for over twenty-two years without a hint that the service will be terminated.
The chancellor's conclusion and the authorities cited by the Parkers, 30 C.J.S. Equities § 16, 27 Am.Jur.2d Equity § 102, that a court of equity will not do or require the doing of a vain or useless thing, overlook this Court's holding in Hutcheson v. Sumrall. The chancellor, therefore, erred when he considered the possible unavailability of electricity as a criterion in determining the existence of the implied easement. This conclusion in no way alters the fact that Fourth Davis has failed to carry its burden of proving that the power line was reasonably necessary for the enjoyment of its property.

4.
Fourth Davis contends that the language of the partition deed between Ernest Parker and the heirs of R. Lee Parker, III, does not negate the existence of an implied power line easement. The chancellor relied upon one portion of the partition deed to conclude that the parties did not intend to create an implied easement across Ernest Parker's tract. That portion provided for the transfer to Ernest Parker of all rights and causes of action existing in favor of the heirs of R. Lee Parker, III, which grew out of or came into existence as the result of the ownership of their undivided interest in the property now held by Ernest Parker. The chancellor apparently concluded that this clause conveyed to Ernest Parker any claim for an implied power line easement that the heirs of R. Lee Parker and Fourth Davis, as the successor of their interest, may have had.
The Parkers contend that the express provision in the partition deed for roadway easements gives rise to an implication that no power line easement was intended. Fourth Davis counters that the express grant of other easements does not negate the creation of an implied easement from a pre-existing servitude. Fourth Davis distinguishes Armstrong v. Pinnacle Coal and Coke Co., 101 W. Va. 15, 131 S.E.2d 712 (1926), in which an implied easement to construct a power line was denied because the specific mention of a roadway easement negated the creation of an implied easement for a power line which was not pre-existing. Fourth Davis urges that Millson v. Laughlin, 217 Md. 576, 142 A.2d 810 (1958), controls this case since the power line in Millson, as in this case, was constructed during unity of title and the partition deed expressly granted a roadway easement. The Millson court found that the express roadway easement in the deed did not negate an implied grant of a power *523 line easement incident to the deed. The court stated:
We think, however, that the two grants here involved are so dissimilar in character that the express easement of travel should not be held as establishing an intention on the part of the parties not to grant an easement which was clearly necessary and perfectly obvious.
142 A.2d at 814. Fourth Davis contends that since the power line was constructed over the Parker property during unity of title and was obvious and permanent, the express grant of a roadway easement does not negate the creation of an implied easement.
We are persuaded that the chancellor erred in finding that the express grant in the partition deed of a roadway easement coupled with its silence as to any power line easement manifests an intention not to grant such a power line easement. Millson v. Laughlin. It was necessary to expressly grant the roadway easement inasmuch as there were two roads joined together which gave access into what is now the Fourth Davis property. As seen before, only one such road could be considered a way of necessity, so that access to both roads required an express clause in the partition deed. Having said this, we note that the chancellor's error does not require reversal since Fourth Davis failed to prove that the power line was reasonably necessary for the enjoyment of their property.

5.
Fourth Davis contends that the chancellor erred in failing to grant a secondary maintenance easement and to enjoin the Parkers from interfering with its plans to string an additional line across the existing poles. Fourth Davis correctly notes that the dominant owner of an easement has the burden of maintenance and repair, and to this end has an implied secondary easement to enter the servient property to perform the necessary maintenance and repair. In Lindsey v. Shaw, 210 Miss. 333, 49 So.2d 580 (1950), we recognized that the owner of a roadway easement is entitled to work the road at his own expense so as to keep it reasonably useable as a private way. In Sumrall v. United Gas Pipeline, 232 Miss. 141, 97 So.2d 914 (1957), we recognized that the owner of a pipeline easement is entitled to full enjoyment of that easement including ready accessibility to the line for maintenance and repair.
If Fourth Davis had established its right to an implied power line easement in this case, it would certainly be likewise entitled to a secondary easement for access across the Parker property to the power line for purposes of maintenance and repair. Lindsey v. Shaw, supra; Sumrall v. United Gas Pipeline, supra. However, we have held that Fourth Davis is not entitled to an implied power line easement in this case, so its claim for a secondary maintenance and repair easement likewise fails.
In conclusion, we find that the chancellor's imposition of the strict necessity requirement was error, but does not require reversal inasmuch as Fourth Davis has failed to show that the power line is reasonably necessary for the enjoyment of its property. Although the chancellor committed other errors of law, they do not require reversal since Fourth Davis failed to establish the requisite degree of necessity to create an implied easement across the Parker property in the first place.

B.

DID THE CHANCELLOR ERR IN GRANTING ANY RELIEF TO FOURTH DAVIS?
The Parkers cross-appeal on the ground that the chancellor erred in awarding Fourth Davis a judgment for the cost of electricity consumed by the Parkers that was paid for by Fourth Davis. The Parkers also contend that it was error for the chancellor to grant Fourth Davis a right to receive electricity across the power line when available.

*524 1.
From 1966 to 1976, the Parkers enjoyed free electricity as part consideration under the C & S Cattle lease. Fourth Davis agreed in negotiations to terminate this lease to pay for electricity consumed by the Parkers for the duration of the lease. With the expiration of this lease ended the Parkers' legal entitlement to free electricity. Although Fourth Davis continued to pay the bills in order to insure uninterrupted service, it is clear that Fourth Davis expected to control the maintenance and repair of the power line in return. The chancellor, having denied Fourth Davis this right, apparently concluded that it was entitled to reimbursement from the Parkers on a theory of unjust enrichment, with the corresponding liability for one-half of the Parkers' cost of maintenance and repair.
The Parkers contend that since Fourth Davis had no easement, it is not entitled to contribution for sums it voluntarily paid to get service from 1977 to 1982. The fact that Fourth Davis does not have a power line easement on the Parkers' property does not absolve the Parkers from liability for electricity they consumed but did not pay for. The principle of restitution is that a person who has been unjustly enriched at the expense of another is required to make restitution to that other. Restatement of Restitution, § 1, Magnolia Federal Savings and Loan Ass'n v. Craft Realty, 342 So.2d 1308 (Miss. 1977).
The Parkers have clearly been enriched by Fourth Davis' assumption of their utility bill for four years. The Parkers failure to base their non-liability on stronger grounds than the asserted charity of Fourth Davis demonstrates that their enrichment was unjust. This is not a case where Fourth Davis has conferred a benefit upon the Parkers without a valid reason for so doing. The negotiations reveal that Fourth Davis no longer considered itself liable for the Parkers' electrical bill, but continued to pay it in order to ensure uninterrupted service. The chancellor properly applied the rule of unjust enrichment to the facts of this case to require the Parkers to reimburse Fourth Davis for the electricity they consumed between 1977 and 1982.

2.
The Parkers object to the chancellor's ruling that Fourth Davis has a right to receive one-half of the electricity through the Parker power line, when available from L P & L. This objection is based on the fact that since the chancellor denied Fourth Davis an implied power line easement, any right to receive electricity through the line should be left to negotiations between the parties. The Parkers assert that the right granted by the chancellor amounts to an "irrevocable license", which this Court has refused to recognize in the law of property. In Belzoni Oil v. Yazoo M.V.R. Co., 94 Miss. 58, 47 So. 468, 472-73 (1908), this Court held that a license may not be made irrevocable, stating:
It is far better, we think, that the law requiring interest in land to be evidenced by deed should be observed, than to leave it to the chancellor to construe an executed license as a grant, depending upon what, in his view, may be equity in a special case.
The Belzoni Court explained that the rule that a license may not be made irrevocable was based on the policy that "gives security and certainty of titles, which are most important to be preserved against defects and qualifications not founded upon solemn instruments."
In Reid v. Horne, 187 So.2d 316 (Miss. 1966), Horne improved Reid's property based upon oral permission to cross the property. When Reid refused to recognize the promise in writing, Horne sued for "an irrevocable license". This Court held that such a license would amount to an easement and ruled against Horne, relying on Belzoni and the statute of frauds.
When, as this Court concludes, the chancellor correctly ruled that Fourth Davis was not entitled to an implied power line easement, it is conceptually difficult to simultaneously find that Fourth Davis had a right to receive power through the line so *525 long as it is available from L P & L. Such a right would appear not to be subject to revocation by the Parkers. Such an irrevocable right to receive electricity would amount to an implied easement.
The chancellor granted Fourth Davis the right to receive electricity based upon the terms of the agricultural lease and the prior conduct of the parties. Fourth Davis enjoyed the electrical service of the power line until 1977 based upon the terms of the C & S Cattle lease. Any judicially established right to continue to enjoy this service short of an implied power line easement would appear to be in the nature of an irrevocable license and thus not within the law of property of this state. Since this Court has concluded that electrical service through the power line is not reasonably necessary, in view of the available alternatives of generators and butane appliances, Fourth Davis must henceforth rely upon these alternatives unless it negotiates an access agreement with the Parkers.

IV.
In conclusion, we affirm the chancellor's finding that no implied easement existed in this case while setting forth the appropriate standards of law to be applied in situations of this sort. We also affirm the chancellor's award of damages to Fourth Davis against the Parkers. Finally, we reverse the chancellor's ruling that Fourth Davis has the right to receive electricity from the power line.
AFFIRMED IN PART AND REVERSED IN PART.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.

*526 APPENDIX A

NOTES
[1] Appendix A shows Davis Island. A dotted line indicates the location of the power line at issue and x's mark the Fourth Davis and Parker dwelling sites.