HUTCHESON, et al. *v.* SUMRALL, et ux.

May 3, 1954

No. 39075 63 Adv. S. 24 72 So. 2d 225

*Charles C. Jacobs, Jr.,* Cleveland, for appellants.

*John T. Smith, W. E. O'Hare,* Cleveland, for appellees.

Lee, J.

Fred Hutcheson and others filed their bill against O. E. and Mrs. O. E. Sumrall, in the Chancery Court of Sunflower County, for a mandatory injunction to require that their water supply, which the defendants had cut off, should be turned on. The amended bill alleged in effect that they, and their predecessors in title, owned and were in possession of their respective properties before and at the time the defendants, and their predecessor in title, purchased the land on which the artesian wells were situated; and that their existing benefit, by reason of a system of pipes and conduits, was of a continuous, permanent and apparent nature, and was necessary for the reasonable enjoyment of their properties. A temporary injunction was issued, but after a hearing of the cause, following the defendants' answer and motion to dissolve, the court entered a decree dissolving the injunction, disallowing damages, and dismissing the bill but permitting the use and enjoyment of the water until November 30, 1952. The complainants appealed, and a Judge of this Court granted supersedeas.

Sunflower Plantation, consisting of several thousand acres of land in Sunflower County, was privately owned

and operated for many years. Two free-flowing artesian wells were drilled to furnish water, and it was piped into a number of the tenant houses on the place.

The Federal Government, about 1936, purchased the plantation and operated it as a cooperative project until 1944. At that time, it began to sell off the acreage in small farms.

Deeds, dated January 1, 1944, were executed by the Government to Fred Hutcheson and wife for fifty acres, to R. K. Campbell and wife for about forty-three acres, and to Dill Lowe and wife for about sixty acres. A deed, dated October 24, 1945, was executed to Archie F. Smith for about 1.6 acres, which was subsequently acquired by Walter A. Johnson.

A deed, dated May 25, 1945, was executed to J. W. Johnson for several parcels aggregating about five acres. The artesian wells, together with a gin, store and other buildings were situated on this land.

All of the deeds contained two provisions as follows: "SUBJECT, however, to such easements and rights of way upon, across, or through the above described lands as heretofore have been granted by the UNITED STATES OF AMERICA, or its predecessors in title for the construction, operation and maintenance of public utility systems, streets, roads and walks; * * * TO HAVE AND TO HOLD the aforesaid premises unto the said grantee and his heirs and assigns forever, together with all hereditaments, improvements and appurtenances thereunto appertaining."

When the Hutchesons took possession of their property, water was being piped to it from the wells. The house on the Campbell property was built about 1924, and has had water ever since. The Lowe property was already connected with water when they moved in. The Walter Johnson property was known as the headquarters of the plantation. It was connected for water when the first well was drilled, and has shared in this water supply ever since. The properties of twelve or fourteen

other families and a church were also connected with, and received water from, these wells.

While J. W. Johnson is the owner of the record title to the land on which the wells are located, the Sumralls are the equitable owners of a one-half interest therein, and they operated a store and gin and lived on the premises.

Dill Lowe, W. B. Britt and Noel Hoffman testified that, on different occasions, a few days before the water was cut off, Mrs. Sumrall, in an effort to get them to trade at the Sumrall Store and Gin, told them that, if they failed to do so, their water would be cut off. They gave her little satisfaction, and thereafter on September 27, 1952, the water was cut off. It was admitted that, when complaint was made to J. W. Johnson, he requested Mrs. Sumrall to cut the water on, but she refused to do so.

Sumrall testified that the people greatly increased their use of water. While stating that they permitted leaks in their pipes, he admitted that he had never complained about it to anyone. He thought the users were not doing right in failing to trade at his store and gin; but he maintained that the pressure from the wells became so weak that he was unable to obtain sufficient water to operate his gin, and that he cut off the water for that reason. Mrs. Sumrall also testified that the pressure had weakened over the past two years, and, on that account, the operation of the gin was interfered with. She admitted that she wanted and expected the store and gin accounts of the water users, and felt that they should trade with her, but that only one of them was a customer. She said that it was her water, and she saw no need to give notice at the time it was cut off.

J. W. Johnson admitted that he knew about the wells at the time he purchased the property, but he did not know that they were supplying water to the various families. He made no inquiry whatever about the matter. The pipes, leading from the wells, were visible; and he

admitted that the slightest inquiry or inspection would have disclosed them.

The appellants make these contentions: Their deeds conveyed the "appurtenances thereunto appertaining." The pipes on the Lowe and Campbell lands were connected with the wells, owned by the Government, before and at the time of the delivery of their deeds, and through the term "appurtenances" they were expressly granted water rights. While the Hutcheson deed was not delivered and recorded until after the receipt by J. W. Johnson of his deed, the Hutchesons were in fact in possession with a promise of sale, and when the deed was delivered, it bore the date of January 1, 1944. While the deed of Archie Smith, the predecessor in title of Walter Johnson, bore a date subsequent to the J. W. Johnson deed, Smith was actually in possession and such possession operated as notice. Besides, this property had been receiving water ever since the first well was drilled.

 ▊ "The term 'appurtenances' has been held to convey easements corresponding to quasi easements existing at the time of the grant, but it will not convey a quasi easement which is not continuous, apparent, permanent, and necessary, * * *". 28 C. J. S. 693, Easements, Section 33-a. ▊ From which it appears that an implied easement must be continuous, apparent, permanent and necessary. And " 'Apparent' in this connection does not necessarily mean 'visible', but includes permanent artificial structures. A use is apparent when it may be discovered upon reasonable inspection." 28 C. J. S. 691, Easement, Section 33-a. See also Note at page 689 thereof.

In 28 C. J. S. 687, Easements, Section 31, it is said: "Easements corresponding to quasi easements existing at the time of the grant are impliedly granted on a conveyance of the quasi-dominant portion of a unified tract. Where both portions are conveyed at the same time to

different grantees, each grantee will take his part with or subject to the apparent, continuous, and necessary uses existing at the time of the severance."

In 17 Am. Jur. 985, Easements, Section 80, it is said: "As a general rule, implied easements are restricted to servitudes which are apparent. * * *". As to whether existing drains, pipes and sewers are apparent, it is also there said: "* * * most courts take the view that appearance and visibility are not synonymous and that the fact that a pipe, sewer, or drain may be hidden underground does not negative its character as an apparent condition, at least, where the appliances connected with, and leading to, it are obvious."

In Toothe v. Bryce, 50 N. J. E. 589, 25 Atl. 182, Toothe had purchased from Bryce forty-five acres of land, on which were situated a dwelling, barn and hothouse. At the time of making the contract of sale, water was flowing continuously from a spring which was situated on other adjacent land owned by Bryce. Toothe observed the flow of water and knew that it was due to the action of a ram. But Bryce stopped the ram from pumping water just before the delivery of the deed. One of the syllabi, after stating the facts, says: "Held, that the flow of water so driven up by the rams was an apparent and continuous easement, which passed with the land conveyed as necessary for the beneficial use of the premises, and with it, as a secondary easement, the right to enter upon the land retained to repair and maintain the rams, and that the defendant did not alter complainant's rights by stopping the flow at the barn just before the delivery of the deed."

In Larsen v. Peterson, 53 N. J. E. 88, 30 Atl. 1094, where the pump was in use and visible, but the attached pipes were underground, "apparent" was held to mean "that the parties should have either actual knowledge of the quasi-easement or knowledge of such facts as to put them upon inquiry."

In Watson v. French, 92 Atl. 290, a Maine case, one syllabus is as follows: "Where plaintiff purchased a parcel of land from defendant's grantor, and such parcel was supplied with water by a pipe running over the land retained by defendant's grantor, defendant took the property subject to plaintiff's easement of necessity, where the pipe was visible." It was also there held that long acquiescence in plaintiff's enjoyment of an easement, claimed to be an easement of necessity, corroborates the claim of a grant by implication.

In Romanchuk v. Plotkin, 9 N. W. 2d 423, a Minnesota case, three houses had been connected for some time to the public sewer by a private line. When Romanchuk purchased his lot on the east, it was so connected. Plotkin, the owner of the other houses, gave notice that the connection would be severed. The court enjoined the disconnection, and said: "The doctrine of implied grant of easement is based upon the principle that where, during unity of title, the owner imposes an apparently permanent and obvious servitude on one tenement in favor of another, which at the time of severance of title, is in use and is reasonably necessary for the fair enjoyment of the tenement to which such use is beneficial, then, upon a severance of ownership, a grant of the dominant tenement includes by implication the right to continue such use. That right is an easement appurtenant to the estate granted to use the servient estate retained by the owner. Under the rule that a grant is to be construed most strongly against the grantor, all privileges and appurtenances that are obviously incident and necessary to the fair enjoyment of the property granted substantially in the condition in which it is enjoyed by the grantor are included in the grant."

Freiden v. Western Bank & Trust Company, 50 N. E. 2d 369, an Ohio case, was a controversy between the owner of a lot, the grantor, and the owners of eight adjacent lots, in respect to the rights and duties of the parties in connection with a sewer traversing all of the

lots. When the sewer was originally run across the nine lots, the property was owned by one person. The third, fourth and sixth syllabi of the decision announced the principles which are applicable here, and are as follows: "Ordinarily, an 'easement' is a right or interest in the land of another, but owner of entire tract or of two or more adjoining parcels may so use a part of such tract or parcels as to create an apparent servitude, termed a 'quasi easement', in favor of another part to which the use becomes appurtenant."

"Where owner of land makes an apparent, permanent, and necessary use of one part thereof in favor of another part, and transfers either or both parts, the grant or reservation of an easement to continue such existing use will be implied."

"The apparent signs of servitude which will pass as 'easements' on severance of a heritage include not only those signs which must necessarily be seen, but also those signs which may be seen or ascertained on careful inspection by persons ordinarily conversant with the subject."

In Shipman v. Lovelace, 214 Miss. 241, 58 So. 2d 657, where the owner of the property erected a house on the north half of the lot and ran the sewer line across the south half of the lot, and subsequently deeded the north half to another person, it was held that "The house, without sewerage, would have been incomplete * * *". It was said to be an adjunct of the lot, "essential and necessary to the free and normal use and enjoyment of the same", and the right to "retain, repair, maintain and use the sewerage line from her house across the south half of the lot" was preserved.

At the time of the execution by the Government of deeds to the appellants, or their predecessors in title, and to J. W. Johnson, the appellants or their predecessors in title were in possession of their properties and were receiving water from the wells. Their enjoyment was continuous and apparent. The set up was of a

permanent nature. Water is a necessity. Consequently, the term "appurtenances" in the deeds conveyed to the appellants easements corresponding to quasi easements, existing at the time of the grants.

The learned chancellor was of the opinion that the water works system, as then existing, did not constitute a public utility; but apparently, he overlooked the question of easements.

The appellees and J. W. Johnson own the land on which the wells are located, and have the first right to water. If the supply decreases to such an extent that it will fulfill their bona fide needs only, then obviously others can not expect to receive water. But, as long as the supply exceeds the bona fide needs of the appellees and J. W. Johnson, the appellants are entitled to share the excess for their bona fide needs. If an interruption becomes necessary, timely notice must be given in advance of cutting off the water.

While the proof was in dispute as to the extent of the pressure, the great weight of the evidence sustains the conclusion that there was no valid reason to cut off the water for any considerable period of time. On the contrary, according to the great weight of the evidence, the water was cut off because the users were not trading at the Sumrall Store and Gin. The application of that kind of economic sanction, under the facts of this case, can not be tolerated.

From which it follows that the decree of the trial court must be, and is, reversed, and a decree will be entered here for appellants, reinstating the injunction and making it permanent.

Reversed and decree here.

*Roberds, P. J.,* and *Holmes, Arrington* and *Ethridge, JJ.,* concur.