**Irma W. BARTMAN, Appellant,**

v.

**O. L. SHOBE et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 2, 1962.

Cyril C. Sehlinger, William Mellor, Louisville, for appellant.

Charles B. Zirkle, Louisville, for appellees, O. L. Shobe & Zelma N. Shobe, his wife, and Shobe, Inc.

J. D. Raine, Louisville, for appellee, D. F. Smith, Assignee for Shobe, Inc.

Jackson & Seiller, Louisville, for amicus curiæ, Louisville & Jefferson County Bd. of Health.

Lucian L. Johnson, Louisville, for amicus curiæ, Jefferson County Board of Education.

Raymond F. Bossmeyer, Louisville, for amicus curiæ, Louisville and Jefferson County Metropolitan Sewer Dist.

PALMORE, Judge.

The controversy here is between the owners of adjoining tracts of land in Jefferson County. The appellant, Irma Bartman, brought suit against the appellees O. L. Shobe and wife, Zelma Shobe, to enjoin further construction and eventual completion of a sewage treatment plant and sewerage system designed to carry off and drain through her property surface waters and sanitary sewage effluent from a residential subdivision being developed on the Shobe property. Because a great deal of money had already been spent on these facilities and the chancellor felt that the private loss and public inconvenience consequent to an

injunction would outweigh its benefit to Mrs. Bartman, he conditioned the grant of such relief upon the failure of the Shobes to comply with whichever of two alternative courses of action outlined in the judgment Mrs. Bartman might choose. She declined them both and brought this appeal, insisting on absolute entitlement to an injunction.

The lands in question lie in the periphery of the burgeoning metropolis of Louisville and its suburbs. The Shobe subdivision, called Zelma Fields, was authorized by the Louisville and Jefferson County Planning and Zoning Commission in July of 1956. It had theretofore been approved by the city-county Health Department for septic tanks. Over the course of the next 2½ years lots were sold and some 15 homes were built. It developed that there were numerous underground springs in the land, rendering it unsuitable for septic tanks during certain months of the year, with the result that in January of 1959 the Board of Health gave notice that no further construction would be authorized unless a different method of sewage disposal were devised. Since there were no public sewer lines and no large streams in the vicinity the engineer employed by the Shobes determined that the only practical solution was a sewage treatment plant. He thereupon submitted plans and designs to and secured approval of the Water Pollution Control Commission of the State Board of Health, the city-county Health Department, and the Metropolitan Sewer District, and then applied for re-zoning to a classification requiring sanitary sewers instead of septic tanks. The sewage treatment plant in question was the method of sanitary sewage disposal proposed in this application. After due advertisement a public hearing on the application was held on July 2, 1959, though Mrs. Bartman did not receive actual notice and was unaware of it. The application was granted by the zoning authority, and work on the project proceeded apace.

Zelma Fields subdivision consists of three sections. Nos. 2 and 3 abut the Bartman property, but No. 3 has not been platted and improved as yet. Sections 1 and 2 comprise 102 lots. By reason of a north-south ridge or hump running through No. 2 the natural surface drainage of 59 of these lots is westward, away from the Bartman land, which lies to the east. The remainder of No. 2 and all of No. 3 drain into the Bartman tract, and to the extent that the surface waters are not absorbed by the ground they flow through a shallow draw or ravine a distance of 1624 feet on the Bartman place to a creek. For the first 436 feet this depression is relatively flat, but for the remaining 1188 feet it has a sufficiently well-defined channel to be called a "wet weather stream." This part of the Bartman property is unimproved and covered with vegetation. Mrs. Bartman regards it as a bird sanctuary at present but contemplates its future sale for subdivision purposes when it ripens to peak value by reason of surrounding residential development.

The controversial disposal plant is located on Zelma Fields No. 2 about 40 feet from the Bartman line. Though its principal function is the treatment of sanitary sewage, it is designed to receive both storm and sanitary sewage through a system of gutters, drains and underground sewer pipes. Thus it will discharge not only the sanitary sewage effluent (after treatment) but also the surface waters that would otherwise drain over the ground and into the draw entering the Bartman tract. The outlet for this purpose is a 27-inch pipe which ends 3 or 4 feet from the Bartman line. In times of heavy rain it is to be expected that such a concentrated flow would result in some degree of erosion to the Bartman property.

All of the surface waters (storm sewage) to be discharged in this manner naturally drain into the depression below the disposal plant, but the installation of gutters, drains and pipes will necessarily accelerate the flow to and onto Bartman. The sanitary sewage will be drawn from the whole subdivision, on both sides of the watershed divide. As presently designed, the plant

will handle a daily maximum of 50,000 gallons of sanitary sewage and will serve Zelma Fields Sections 1 and 2. When these two sections are fully developed and populated there will be a small flow of sanitary sewage effluent all the time, averaging the equivalent of 3 or 4 garden hoses, with a peak flow of about 5 garden hoses. (We are speaking now of the sanitary sewage effluent only, exclusive of storm sewage.) When Section 3 is developed it will be necessary to expand the plant capacity by an additional 40,000 gallons per day. It is so designed that it can be expanded eventually to a total capacity of 160,000 gallons. Contractual arrangements have been made whereby it will, upon completion, be conveyed to and operated by the Metropolitan Sewer District, a public agency.

The sanitary sewage effluent will be in the form of a clear liquid, less impure than ordinary surface water. It could be handled through an 8-inch pipe, whereas the combination with storm sewage will require a 27-inch pipe.

Mrs. Bartman learned of the construction in progress on November 3, 1959. She saw her attorney immediately, and on November 4 he notified the Shobes that she would resist "the flow of any kind from this plant onto her property." The Shobes took the matter up with their counsel at once, and on November 17, 1959, he replied to the effect that the project had been duly approved and he did not believe Mrs. Bartman had a valid objection. There was no further communication between the parties until Mrs. Bartman brought this suit on April 11, 1960.

At the time Mrs. Bartman's attorney wrote the Shobes on November 4, 1959, all of the construction work for the disposal plant and the storm and sanitary sewerage systems throughout Zelma Fields Sections 1 and 2 had been let out on contracts, and a substantial percentage of it had been completed. Work was finally halted about the middle of December, 1959, when the Shobes ran out of working capital, and at this time

the outstanding contracts, totalling $157,000, had been performed to the extent of $114,000, based on the engineer's estimates. (He estimated, incidentally, that $80,000 had been completed by November 3.) As of December 15, 1959, the percentage of completion was 95% on the sanitary sewage collection system, 74% on the treatment plant, and 30 to 50% on the storm sewerage. Completion of the project is contemplated by third parties who have contracted, on certain conditions, to buy the Shobes out.

To round out the picture, it should be mentioned that two innocent bystanders have built new houses in Zelma Fields No. 1 and are unable to sell or use them because septic tanks are no longer permitted and the sanitary sewerage facilities have not been and cannot be completed if Mrs. Bartman is granted an unconditional injunction. These individuals testified as witnesses but are not parties. Each has spent $12,000 on a house built to sell in the $16,000 bracket. In addition, one of them owns several other lots in the subdivision, which he purchased in order to build and sell houses. Without some means of sewage disposal this investment will, of course, be a dead loss. With respect to the more fortunate residents whose homes were completed before septic tanks were prohibited, the public problem that gave rise to the prohibitive order of the Board of Health in the first place presumably still exists.

Faced with this singularly difficult situation, after personally visiting the premises with counsel and receiving estimates of what it would cost to run pipes across the 1624 feet of Mrs. Bartman's tract between the subdivision and the creek the chancellor decided to "balance the equities," and he granted an injunction contingent on the failure of the defendants to comply with whichever of the following options Mrs. Bartman should choose:

(1) Defendants to construct across her land, following the meanders of the "wet weather stream," an 8-inch pipe the full length of 1624 feet to the creek and, in

addition, to pay Mrs. Bartman $2,834, that sum being equivalent to the cost of 436 feet of 27-inch pipe.

(2) Defendants to construct across her land a 27-inch pipe along the first 436 feet and, in addition, pay her $2,273.60, that sum being equivalent to the cost of an 8-inch pipe for the entire distance of 1624 feet to the creek.

The judgment further provided that Mrs. Bartman could require the defendants to purchase, at a price to be determined by court-appointed appraisers, all of her property within a radius of 200 feet of the sewage treatment plant. The reason for this provision was that FHA loans generally are not made for residential construction within that proximity to a disposal plant, and the city-county Health Department, though it has no regulation to that effect, recommends likewise.

The alternatives offered in the judgment as to the 8-inch and 27-inch pipe are based on the theory that the Shobes have a right, within the bounds of reason, to accelerate the discharge of their storm water onto the Bartman tract (cf. Wallace v. Schneider, 1949, 310 Ky. 17, 219 S.W.2d 977, and Jarvis v. Cornett, Ky.1953, 257 S.W.2d 524), but not in a channeled stream until it reaches the well-defined "wet weather stream" 436 feet below the property line, and that they have no right to discharge any of the sanitary sewage effluent upon her land. (As the defendants do not appeal, we need not question these conclusions.) In effect, therefore, the Shobes were required to pipe all of the water the first 436 feet but only the sanitary effluent for the rest of the way.

Counsel for Mrs. Bartman raise forceful objections to this solution. They say it permits condemnation by a private person for private use, and that in any event the Shobes get a free easement across her land. They argue that the discharge of sanitary sewage effluent onto the Bartman property is more than a nuisance, and is a trespass, for which reason the doctrine of balancing the interests is not applicable. And it is

suggested that if the sewage treatment plant is to be operated by the Metropolitan Sewer District, then let that agency exercise the right of eminent domain in due and proper fashion. They stand on the ancient rights of private property.

The chancellor conceded that if this suit had been brought before so much had been expended on the project he would have awarded an unconditional injunction. He rejected the defense that Mrs. Bartman was estopped by her failure to sue more promptly. But he was sensible of the economic waste and damage as compared with the injury Mrs. Bartman would avoid thereby, and he sought a reasonable way out. In taking this approach we believe he was right.

 Let us consider some of the elementary principles applicable to equitable relief. Granted the general rule that an injunction will be granted to prevent irreparable damage, and sometimes to obviate a multiplicity of lawsuits, it is not always so as a matter or right. It may be denied, and the plaintiff left to whatever legal remedy he may have, if with good reason the chancellor finds that an injunction would be inequitable. "Injunctive relief, in common with most other equitable weapons, though perhaps to a greater degree, has great potency for harm when misapplied, and for this reason courts consider every application for its employment in the light of its consequences to both parties, and to that end consider the 'balance of inconvenience,' frequently withholding the granting of an injunction when the benefit to the plaintiff will be small in comparison to the injury to the defendant." Lawrence on Equity Jurisprudence, Vol. 2, p. 1179 (§ 1096).

In equity the rule of reason has always reigned supreme. In every case where injunctive relief is denied because the plaintiff has an adequate remedy at law there is, in practical effect, a "private condemnation" in that the law refuses to stop one party from invading another's property rights and

paying later. And when we consider the equitable nature of this remedy, what real and reasonable difference stands between a nuisance and a continuing trespass? One is simply more visible and tangible than the other. But the tangibility or technical classification of the civil wrong has little to do with the gravity of its effect, and it cannot be the basis of any rational distinction in equity. No one would deny, for example, that a shaking of the earth or a diffusion of revolting odors can be just as offensive and destructive of property values as a stream of water, and an equally effective invasion of the offended party's property rights.

■ Faulkner v. Lloyd, Ky.1953, 253 S.W.2d 972, gives example of a direct, clear and unequivocal invasion of property rights in which this court, through the balancing of interests, permitted what might be considered a "private condemnation." A property owner inadvertently built his garage 4½ feet over on his neighbor's lot. The neighbor sought an injunction requiring its removal. It was held that the judgment should give the defendant the choice of paying the reasonable value of the strip of ground or removing the garage from it. Yet surely in that case the prospect of removing or even destroying his garage would have been far less a catastrophe to the defendant than would the loss of well over $100,000 to the defendants in this case. The answer to the "condemnation" argument is that one who comes to equity does so by choice. Equity forces nothing from him, and he may stand on his legal remedies if he wishes. But if he wants equity he must do equity.

"An injunction ought not to be granted where the benefit secured by it * * * is comparatively small, while it will operate oppressively and to the great annoyance and injury of the other party and to the public, unless the wrong complained of was so wanton and unprovoked as to properly deprive the wrongdoer of all consideration for its injurious consequence." Burnam, J., in

Herr v. Central Ky. Lunatic Asylum, 1901, 110 Ky. 282, 22 K.L.R. 1722, 61 S.W. 283 (at pp. 284, 285).

We cannot accede to the proposition that this is not a case in which the interests of the parties and the public may be balanced in granting or withholding the equitable remedy of injunction.

Consider now the situations of the respective parties, and the public interest as well. Mrs. Bartman artlessly acknowledges that she has been advised to hold onto the acreage through which this drainage runs until its value is further enhanced for subdivision purposes. Such enhancement depends on surrounding residential development such as this very Zelma Fields subdivision. Choking the latter off therefore cannot bring to Mrs. Bartman an unmixed blessing. And if the proposed drainage is effected through an underground conduit, what substantial damage will be done her, unless by the mere proximity of the sewage treatment plant?

■■ A sewage treatment plant is not a nuisance per se. City of Harrodsburg v. Brewer, 1932, 243 Ky. 378, 48 S.W.2d 817. And if it is so operated as not to be a nuisance, it cannot be made a nuisance by force of any standing policy of FHA or the Health Department with respect to residential construction within its environs. That a particular structure may be such as to make it less desirable to build a home near it, and thereby affect the value of adjacent property, does not necessarily make it unlawful. We cannot say that the mere presence of the sewage treatment plant will constitute a nuisance. Thus the provision of the judgment giving Mrs. Bartman the option of requiring the defendants to purchase all of her property with 200 feet of the plant was premature. It will be due time to consider that sort of measure if and when it should develop that the plant in actual operation is a nuisance. The privy case, Miley v. A'Hearn, 1892, 13 K.L.R. 834, 18 S.W. 529, is distinguishable because under its particular circumstances the

court felt able to say as a matter of law that a nuisance would exist. A reading of that opinion will satisfy any skepticism in this respect.

Eliminating the treatment plant until such time as it can properly be determined whether it actually is a nuisance, it may be seen that the *actionable* damage to which Mrs. Bartman will be subjected is neither great nor truly irreparable. Her right to equitable relief therefore rests on the continuing nature of the wrong, in that she ought not to be subjected to the necessity, unless she so elects, of bringing a succession of damage suits.

On the other side of the scales, the damage to the Shobes from an injunction is obvious and great, far outweighing any just benefit to Mrs. Bartman. It may be argued that the Shobes ought to have known better, but it must be recognized that they were not lawyers. Like any other ordinary citizen, they must have thought that what was planned by a qualified engineer and specifically approved by a veritable battery of public authorities was permissible and proper. When they received notice from Mrs. Bartman they consulted their attorney, who apparently did not think they were in trouble. Their contracts had been let and the performance well under way. We may doubt their prudence in not taking more initiative in seeking out Mrs. Bartman for further discussion, but certainly we find no substantial indication of bad faith.

Perhaps of greatest significance is the public interest in whatever precedent may be established in this case. We fully appreciate private property rights, but the world moves on, and we are equally responsive to the difficult problem that sewage disposal presents in populous areas such as Jefferson County, where for reasons both physical and financial public sewerage systems are not available in outlying areas. Where septic tanks are prohibited out of considerations of public health the land cannot be developed to meet the requirements of a rapidly blooming population un-

less other means of sewage disposal are made possible. Sewage treatment plants pose no threat to the well-being of anyone. Indeed, there are several in Jefferson County, from which the effluent flows on the surface of the ground through residential property. At most, the only possible offense is esthetic.

The suggestion that the acquisition and development of sewage disposal and sewerage facilities ought to be left to public agencies is not feasible. The taxpaying public will not permit it. Hence it is the general practice of governmental agencies, dictated by practical necessity, to require real estate developers to complete their utility installations at their own expense before they are accepted in behalf of the public. We may observe, too, that such a practice is to be treasured in the interests of private enterprise.

We come now to the details of the judgment. Mrs. Bartman's contention that the price of pipes will not pay for an easement is well taken. We agree also that under the circumstances it is not enough to lay a pipe on top of the ground. And in view of the fact that Mrs. Bartman is being subjected to a legal wrong, we think it is hypertechnical to say that for the last 1188 feet she cannot have a 27-inch pipe because the surface water would flow there anyway. Our conclusion is that in lieu of the various conditions and alternatives decreed by the chancellor the judgment should grant an injunction unless within a reasonable time the defendants satisfy the following requirements:

(1) Defendants to lay a 27-inch pipe underground from the treatment plant to the creek, following the course of the ravine, or, if she so prefers, pay Mrs. Bartman a sum equivalent to what it would cost to do so.

(2) Defendants to pay Mrs. Bartman the reasonable value of a perpetual easement to accommodate such a pipe line, as determined by appraisers to be appointed by the chancellor.

Should Mrs. Bartman decline to accept these conditions defendants will be entitled to judgment and costs. In that event her legal remedy remains unabridged, and her ancient and constitutional rights unimpaired.

The cause is reversed with directions to enter a judgment in accordance with this opinion.

MONTGOMERY J., dissents.