530 So.2d 1325 (1988)
GULF PARK WATER CO., INC.
v.
FIRST OCEAN SPRINGS DEVELOPMENT CO. and Pine Island Golf Course, Inc.
No. 57751.
Supreme Court of Mississippi.
July 27, 1988.
*1326 Michael S. Allred, David A. Barfield, Satterfield & Allred, Jackson, for appellant.
John G. Corlew, Michael O. Gwin, Watkins, & Eager, Jackson, for appellees.
Before DAN M. LEE, P.J., and PRATHER and SULLIVAN, JJ.
DAN M. LEE, Presiding Justice, for the Court:
This appeal brings to this Court the question of whether Gulf Park Water Co., Inc. (Gulf Park) will continue to discharge effluent from its troubled sewage treatment plant into a lagoon located on nearby Pine Island Golf Course (Pine Island) in Jackson County, Mississippi. The chancellor enjoined Gulf Park from using the lagoon as part of its final treating process, ordered Gulf Park to pay damages to Pine Island and First Ocean Springs Development Co. (FOSDC), and ordered Gulf Park to connect to a different system in order to dispose of its sewage effluent. From that ruling Gulf Park appeals, assigning three errors:
I. The chancery court's holding that Gulf Park Water Company, Inc., had a license, revocable at will, and not an implied easement to use a lagoon located on Pine Island Golf Course as part of its sewage treatment facility was manifestly in error, against the overwhelming weight of the evidence, and not supported by any credible evidence.
II. The chancery court's decree enjoining Gulf Park Water Company, Inc., to cease using the lagoon on Pine Island Golf Course and to discharge its sewage treatment effluent elsewhere was manifestly incorrect, against the overwhelming weight of the evidence, and unsupported by any credible evidence. There was no proof of irreparable harm and the lower court lacked jurisdiction to alter Gulf Park Water Company, Inc.'s sewage treatment facility system.
III. The chancery court's award of monetary damages to appellees for the cost of electricity to pump water into the lagoon and the cost to maintain the golf course was against the overwhelming weight of the evidence and unsupported by any credible evidence.
Appellees Pine Island and FOSDC originally filed a cross-appeal assigning four errors below. Pine Island and FOSDC withdrew their cross-appeal on May 19, 1988, prior to oral argument on the merits that date. Gulf Park expressed no opposition to this withdrawal.
For the reason that we think the chancellor reached the best possible remedy in a difficult case, we affirm.

I.

PROCEDURAL SETTING
First Ocean Springs Development Co. (FOSDC) and Pine Island Golf Course, Inc. (Pine Island) filed a bill of injunction and asserted a claim to monetary damages on September 25, 1981. The bill of injunction *1327 listed as defendants Gulf Park Water Co., Johnson, Limited, Inc., and Glenn K. Johnson, d/b/a Johnson, Ltd., Utility. All defendants other than Gulf Park were dismissed at the end of trial. The bill basically alleged that Gulf Park had no authority to continue pumping effluent into the lagoon and that plaintiffs lacked an adequate remedy at law. The bill further alleged damages in the amount of $3,000 per month from and after July 1, 1981.
Gulf Park and the other defendants answered, denying lack of authority to use the lagoon, and they asserted numerous affirmative defenses, including the existence of an easement and an interminable right to continue using the lagoon by virtue of Gulf Park's permit from the State of Mississippi.
Gulf Park in its answer asserted a counter-claim seeking to confirm in it a perpetual easement to use the lagoon. In its answer it made a cross-bill against defendant/intervenor Mississippi Commission on Natural Resources (Commission) and the Mississippi Bureau of Pollution Control Permit Board (Permit Board). Gulf Park sought to enjoin the Permit Board from rescinding its permit and it sought a court-fashioned scheme to modify its permit in the event plaintiffs prevailed.
The Permit Board and the Commission intervened as defendants, answering both complaints, and including a cross-bill against both sides basically seeking to preserve the structure of the sewage treatment as provided in its permit to Gulf Park.
Pine Island and FOSDC answered, asserting that though the Commission and the Permit Board had authority to grant a permit, this did not alter FOSDC's title to the lagoon.
Trial began on May 16, 1983. The court held a subsequent evidentiary hearing January 3 and 4, 1985, and a final decree was not rendered until February 25, 1985. The decree enjoined further use of the lagoon after July 1, 1985, and assessed damages in favor of Pine Island and FOSDC in the amount of $35,472 prior to January 1, 1985, and $902 per month from January 1, 1985, through July 1, 1985, when use of the lagoon was to terminate. The chancellor retained jurisdiction over future operations of Gulf Park and the location of a new discharge point from the treatment plant.
After the chancellor denied the motion by Pine Island and FOSDC for a rehearing or, in the alternative a new trial on the issue of damages, Gulf Park perfected this appeal.

FACTS
Prior to the chancellor's decision Gulf Park Water Co. (Gulf Park) used a lagoon located on Pine Island Golf Course as the final treatment step for sewage treated at its plant. Gulf Park would pump sewage effluent from its plant to the lagoon, approximately one-half mile away. The effluent would then be used to water the golf course through the course sprinkler system, providing both irrigation and a final filtering system for the treated sewage.
When and how Gulf Park obtained the right to use the lagoon, the extent of that right, and the consequences of irrigating the golf course with this effluent were all factual issues before the chancellor. Pine Island and FOSDC, which owns the property and leases it to Pine Island, maintained that the treatment plant deteriorated, and the resulting foul effluent spread algae on the course, killing grass and making the golf course virtually unplayable.
After negotiations for payment of electric and water bills broke down, Pine Island and FOSDC filed their bill for injunction and for damages against Gulf Park, seeking to prevent continued use of the lagoon. The Mississippi Commission on Natural Resources and the Mississippi Bureau of Pollution Control Permit Board intervened because of the effect this suit could have on Gulf Park's waste disposal permit.
This litigation did not begin and end with just these parties, however. A proper perspective of this dispute necessarily involves a discussion of other individuals, companies, and corporations that previously owned either the golf course, the sewage treatment plant, or both.
*1328 The seeds of this dispute were sown in 1972. American Capital Land Corporation owned large tracts of property in Jackson County near the Mississippi Sound. American Capital and another company unconnected with this litigation set about developing a community area which came to be called Gulf Park Estates. At the time, American Capital also owned the property on which now sits Pine Island Golf Course.
September 25, 1972, the State directed both American Capital and the other developer to work together on a single sewage treatment system to serve the subdivision. On October 31, 1972, American Capital entered into a contract to convey property to FOSDC for construction of what eventually became Pine Island Golf Course. FOSDC received the property for little or no consideration and agreed to pursue additional construction financing from the Small Business Administration. This property is near Gulf Park Estates, and there is little question that American Capital expected the golf course to enhance the value of the subdivision.
The contract also provided:
IT IS FURTHER UNDERSTOOD by and between the parties hereto that plans for proposed golf course shall be subject to the approval of American Capital Land Corporation and that the conveyance of said property shall be made upon the funding of the proposed golf course development project by the Small Business Administration.
Though American Capital retained a right of approval, FOSDC hired and paid the architect and construction contractor for the golf course. Even prior to entering the contract to convey, on October 25, 1972, the president and principle stockholder of FOSDC, E.W. Blossman, received a design for the course from the architect, Pete Dye & Associates. Blossman testified that the golf course construction plans called for a lake on the course to provide a water collection point from which the course sprinkler system could draw water. The design did not, however, contemplate using the lagoon to receive sewage effluent, he testified.
Planning for the sewage treatment plant continued during this time. Initially, American Capital hired engineer Perry Ransom to design an advanced chemical treatment facility that could discharge its finished effluent directly into the Mississippi Sound. The cost of such a sophisticated system was prohibitive, however, and in February or March of 1973, American Capital opted, instead, to seek approval of another treatment system wherein secondarily treated effluent would be pumped into a holding pond on the golf course, and then subsequently sprayed onto the golf course. The new plan, utilizing a holding pond and the same sprinkling system necessary for irrigating the golf course, was officially approved in April 1973. Final design requirements were sent to American Capital in June 1973.
Though the treatment plant stands near the Mississippi Sound, there is no dispute that the effluent from this plant would damage aquatic life and necessitate closing shellfish harvesting areas of the sound. There likewise was no dispute that absent construction of the highly sophisticated treatment plant, Gulf Park could not have obtained a permit to discharge into Mississippi Sound.
Meanwhile, American Capital conveyed the property for the golf course by warranty deed to FOSDC on August 23, 1973. The deed contained no reservations and warranted against any encumbrances. Blossman, the principle of FOSDC, testified that American Capital never informed him it intended to use the course holding pond to receive sewage effluent.
When deeded to FOSDC, the golf course was mostly complete. Construction of the sewer system also had begun, but the record is not clear at this time to what extent the sewage pipes were laid from the treatment plant to the lagoon. Engineer Ransom apparently never communicated with Pete Dye and Associates, the golf course architects, concerning the effluent discharge into the lagoon.
There was evidence tending to establish that the plant was operational a full year before July 1975, though no permit was *1329 actually issued until 1978, after American Capital sold Gulf Park.
FOSDC originally intended to lease to someone else, but eventually leased the golf course to Donald C. Armbrust, president of American Capital.
Thus, from the time the plant became operational sometime in 1974, until sometime in 1977, apparently sewage effluent from American Capital's water company was sprayed onto the golf course leased by the president of American Capital.
Two things happened as a result of American Capital going into bankruptcy, however. First, Armbrust defaulted on the lease, and the golf course returned to FOSDC. Second, the stock of Gulf Park was acquired by Aristide LeFeve and Templeton Fowlkes.
Blossman, on behalf of FOSDC, initially allowed the local Y.M.C.A. to operate the course, then leased the golf course to Pine Island, of which Blossman owns 75%. Martin Reeves, the course manager and pro, owned the remaining 25%.
Before leasing the course to LeFeve and Fowlkes, however, Blossman either first learned of, or first became alarmed by, the effluent discharge.
By letter dated April 14, 1977, FOSDC gave notice to Gulf Park that it owned the golf course and the irrigation pond. The letter stated that in the event FOSDC became unsatisfied with effluent being pumped from the pond, it could terminate Gulf Park's use on six months' notice.
Sometime after LeFeve and Fowlkes took control of Gulf Park, Blossman informed them that the pond's operation had become unsatisfactory. LeFeve then agreed Gulf Park would pay the electric bill for pumping the effluent from the lagoon onto the golf course, and agreed to provide additional water as needed.
LeFeve had other business interests with Blossman, and apparently agreed to this arrangement in hopes of developing a favorable relationship. This electricity and water arrangement continued until about the time Glenn Johnson entered the picture in April 1981.
During the time LeFeve and Fowlkes owned Gulf Park's stock, the state received complaints about the plant. By early 1981, the state initiated enforcement proceedings against Gulf Park, but a scheduled April 15, 1981, "show cause" hearing did not take place since the state knew of Johnson's pending acquisition of Gulf Park stock.
About the time Johnson acquired Gulf Park, he met with Blossman and Martin Reeves. Johnson testified he told Reeves that Pine Island would no longer receive free water and Gulf Park would no longer pay the electricity bills. Blossman and Reeves responded that effective July 1, 1981, Gulf Park would no longer be permitted to pump sewage effluent into the golf course lagoon. As a result of Johnson's denial of free water, FOSDC and Pine Island dug five wells to provide water for irrigation. Gulf Park continued, however, to utilize the lagoon until the chancellor ordered this to cease.
Johnson readily admits that Lefeve and Fowlkes did not maintain the plant properly. The record is replete with references to sewage problems. However, there was also testimony that effluent quality was poor even after Johnson began operating the plant. Charles Chisholm of the Mississippi Commission on Natural Resources testified that Gulf Park remained a pollution problem even after Johnson took over.
Reeves testified that about this time the golf course began having algae problems. At trial Reeves produced photographs of several greens and fairways where algae had killed grass. There was testimony that the lagoon contained sewage particles far in excess of state and Environmental Protection Agency guidelines. However, there was conflicting evidence concerning whether the high concentration of sewage caused the algae problems at Pine Island Golf Course.
The chancellor found Gulf Park had no legal right to discharge effluent into the lagoon. The chancellor found that Gulf Park should no longer discharge sewage *1330 effluent into the golf course lagoon, but set in his decree a cut-off date of July 1, 1985.
In his February 25, 1985, decree, the chancellor awarded $21,000 in damages based on Gulf Park's failure to pay electricity bills for pumping effluent out of the lagoon. The chancellor awarded $6,552 damages for increased fungicide the golf course used to combat the algae, and the chancellor awarded $7,920 damages for labor related to fungicide treatments, for the total of $35,472 damages prior to January 1, 1985. From January 1, 1985 to the cut-off date of June 1, 1985, the chancellor assessed damages of $902 a month.
The chancellor also decreed that Gulf Park submit a report detailing efforts to bring its system into compliance with state pollution control standards. As noted previously, the chancellor retained jurisdiction over the plant operation for purposes of monitoring compliance.
Gulf Park was directed to immediately seek an alternative discharge point to the lagoon, but was enjoined from discharging effluent into the Mississippi Sound or its tributaries unless or until it acquired a permit.

II.

LAW

Did the Chancellor Err in Failing to Find an Implied Easement?
Gulf Park argues here that the chancellor's finding that no easement existed was against the overwhelming weight of the evidence. Gulf Park claimed an easement in its answer by way of cross-claim (counter-claim) and by way of an affirmative defense, thus it bore the burden of proving the claim. See McWilliams v. Watkins, 430 So.2d 854, 857 (Miss. 1983); Graham v. Pugh, 417 So.2d 536, 540-41 (Miss. 1982).
All ought be familiar with our limited scope of review of findings of a chancellor. We generally will not reverse a chancellor's finding of fact where it is supported by substantial evidence and not manifestly wrong. See Mullins v. Ratcliff, 515 So.2d 1183 (Miss. 1987); Brown v. Williams et al. 504 So.2d 1188, 1192 (Miss. 1987); Harkins v. Fletcher, 499 So.2d 773, 775 (Miss. 1986); Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986); Will of Polk, 497 So.2d 815, 818 (Miss. 1986). As we stated in Mullins:
This Court must examine the entire record and accept
that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact ...
[Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983)]
And, finally, the trial judge, sitting in a bench trial as the trier of fact, has sole authority for determining credibility of the witnesses. Hall v. State ex rel. Waller, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963). This Court must examine assignments of error in light of the aforementioned principles.
515 So.2d at 1189.
Addressing the merits
It is well established in our law that an easement may be created by grant, implication, or prescription.
Mississippi State Highway Commission v. Wood, 487 So.2d 798, 804 (Miss. 1986) (citing Logan v. McGee, 320 So.2d 792 [Miss. 1975]). Our law provides "[t]hat an implied easement must be continuous, apparent, permanent and necessary... . A use is apparent when it may be discovered upon reasonable inspection." Hutcheson et al. v. Sumrall et ux, 220 Miss. 834, 840, 72 So.2d 225, 227 (1954). Wood, 487 So.2d at 804 (quoting Hutcheson).
According to this Court's holdings in Wood and Fourth Davis Island Land Co. v. Parker, 469 So.2d 516, 520-21 (Miss. 1985), strict necessity is not required for an implied easement when the easement is not in the form of a way of necessity. If the easement sought is not a way of necessity, all that must be proven is a reasonable necessity. The Court in Wood and Fourth Davis spoke of these implied easements as being "highly convenient or essential to the *1331 full enjoyment of the land." Wood, 487 So.2d at 804; Fourth Davis, 469 So.2d at 520-21.
"[T]he necessity should be judged by whether an alternative would involve disproportionate expense and inconvenience, or whether a substitute can be furnished by reasonable labor or expense." Fourth Davis, 469 So.2d at 521.
Gulf Park seemingly argues that this case presents a situation where a use was imposed on the golf course at the time American Capital severed the property, raising the right implied in law to continue such use. Gulf Park cites this passage from 25 Am.Jur.2d, Easements and Licenses § 27 (1966):
Where during the unity of title, an apparently permanent and obvious servitude is imposed on one part of an estate in favor of another part, which servitude is in use at the time of severance and is necessary for the reasonable enjoyment of the other part, on a severance of the ownership a grant of the right to continue such use arises by implication of law. Similarly, where the owner of property, one part of which has been subjected to such a use for the benefit of another part, sells both parts to different purchasers, the respective portions granted are subject to or benefited by, as the case may be, an easement corresponding to such use.
[emphases added]
Gulf Park cites cases where servitudes were "in use" at severance. See Shipman v. Lovelace, 214 Miss. 241, 58 So.2d 657 (1952) (sewage line and driveway existing at time of deed); Hutcheson v. Sumrall, 220 Miss. 834, 72 So.2d 225 (1954) (water being pumped to dominant tenement from well on servient tenement at time grantee took possession); Fourth Davis, supra, (existing power line at time of severance).
In Hutcheson we quoted with approval this language from 28 C.J.S. Easements, § 31:
Easements corresponding to quasi easements existing at the time of the grant are impliedly granted on a conveyance of the quasi-dominant portion of a unified tract. Where both portions are conveyed at the same time to different grantees, each grantee will take his part with or subject to the apparent, continuous, and necessary uses existing at the time of the severance.
In the cases relied upon by Gulf Park, the question of whether a use or "quasi-easement" existed at severance was not an issue on appeal. The proof here failed to establish a servitude or "quasi-easement" existing at severance, however, and for this reason Gulf Park's claim fails.
It is very unclear whether any actual pipe-laying or construction leading from the sewage treatment plant to the golf course had begun when Blossman received the golf course deed on August 23, 1972. Blossman testified that the golf course construction plans called for a lake to provide a water collection point for the course sprinkler system, but he never knew of any plans to use this lake as a discharge point for effluent. As noted in the facts above, Gulf Park engineer, Ransom, testified that construction of the plant and its pipelines commenced soon after June 27, 1973, the date the design received final approval from what was then the Air and Water Commission. Thus, "actual field construction" preceded the deed from American Capital to FOSDC by about two months. Photographic exhibits introduced at trial show that after completion the effluent pipe was clearly visible, extending upward out of the water in the middle of the lagoon. However, from the facts just noted, there appears to be little concrete evidence that someone could have discovered the sewer pipe or any construction for the pipe leading to the pond at the time FOSDC received its deed.
Gulf Park seems to suggest that since American Capital reserved control over construction of the golf course it in effect reserved the right to create its own easements. Thus, it appears to argue it could impose a servitude, and make it "in use" any time before the golf course was completed. Gulf Park states, "the servitude was effectively in use at the time of the conveyance... ." Based on this, Gulf Park argues that the "fact that the lagoon may *1332 not have been actually receiving effluent at the time of the conveyance from [American Capital] to FOSDC does not destroy the creation of an implied easement."
Recently, this Court in Mississippi State Highway Commission v. Wood, supra, affirmed a chancellor's decision creating an implied easement in favor of the Highway Commission which apparently did not previously exist. However, in that case the chancellor fashioned this remedy to allow the highway department to correct an altered location of a ditch which the highway department did originally dig to provide drainage from a state highway. Thus, it appears that the chancellor merely fashioned a remedy to allow the commission to deal with essentially what was a pre-existing easement.
Gulf Park cites no authority for the proposition that one may, in a contract for sale of property, impliedly reserve the future right to create unspecified implied easements despite warranting that no such encumbrance is reserved. It does not seem that such a rule should be applied in this case. There is little evidence that the "implied easement" was actually in use at the time of transfer, merely planned and being constructed. At the time FOSDC contracted to purchase the property, no easement was contemplated. If the grantor wanted to reserve an easement, it could have done so in the deed. Where an easement is only unilaterally planned by the grantor at the time of transfer, and is not reserved in the deed, it seems difficult to imply the easement on the grantee's property.
Appellees cite two cases as support for a similar argument that a grantor attempting to establish an implied easement has what amounts to the heavier burden of demonstrating "strict necessity." Dabney v. Child, 95 Miss. 585, 48 So. 897-98 (1909); Gulf Refining Co. v. Terry, 163 Miss. 869, 142 So. 457 (1932).
Gulf Park goes on to argue that its use was apparent because under the circumstances Blossman could have discovered the sewage treatment plans for the lagoon. Again, Gulf Park cites Am.Jur.2d. For Gulf Park to prevail on this point it must argue that "apparent" includes something discernable from other than a reasonable inspection of the property. Engineer Ransom testified that he did not consult with the golf course architect. All reports from the state and Ransom went only to American Capital, which, of course, had not intended to use the lagoon for sewage treatment when it negotiated its purchase agreement with FOSDC. Gulf Park points to nothing in the record where American Capital actually informed FOSDC that it intended to use the lagoon.
Also, while sewage system construction had begun, there is little evidence that any "apparent" construction linking the sewage treatment plant with the lagoon had been accomplished by the time Blossman received his deed. Thus, it seems that by a reasonable inspection of his property, Blossman would not have discovered the use.
At oral argument before this Court, Gulf Park suggested that it acquired an easement by estoppel. Gulf Park cites United States v. Thompson, 272 F. Supp. 774, 784 (E.D.Ark. 1967), where it is said
An "easement by estoppel," as the Court uses the term, means an easement which is created when a landlord voluntarily imposes an apparent servitude on his property and another person, acting reasonably, believes that the servitude is permanent and in reliance upon that belief does something that he would not have otherwise or refrains from doing something that he would have done otherwise. [citations omitted]
As the facts discussed show, there was a factual dispute as to whether FOSDC ever voluntarily imposed any servitude on its property. It appears the chancellor could have found that American Capital involuntarily imposed this servitude and FOSDC, after discovering the use, informed Gulf Park that it did not consider the servitude permanent but rather permissive. The chancellor was within the facts in finding no easement.
We note that there exists authority for a "judicially created easement by a sort of non-statutory eminent domain," even without *1333 any act by the servient tenant tending to establish the easement. 3 Powell on Real Property Paragraph 412 (P. Rohan ed. 1987). The editors suggest this judicially-created remedy has been applied in cases similar to ours. See Bartman v. Shobe, 353 S.W.2d 550 (Ky. 1962) (court affirmed easement for sewage effluent drainage based on balancing the equities). In other similar cases, some courts have denied injunctions based on instigation of eminent domain proceedings.
Where a quasi-public body, such as a railroad, constructs tracks or other structures without securing needed land rights, it is trespassing upon the land of another. If the construction has involved substantial expense and serves the public need, a court may refuse to enjoin the trespass, provided the railroad promptly initiates and executes a proceeding to acquire the needed land rights by eminent domain.
Id. Since Gulf Park is not a quasi-public body having the power of eminent domain, a balancing of the equities approach may be the only basis for denying an injunction. The chancellor did not find that the balance tilted in Gulf Park's favor, however, and this determination is likewise subject to the scope of review mentioned above. We cannot say that the chancellor was manifestly wrong in this, particularly in light of the evidence that Gulf Park continued to discharge inadequately treated effluent even after Glenn Johnson took over.
Gulf Park's argument that only a judicially-created easement will resolve the "anomalous" decision by the chancellor does not persuade us. First, Gulf Park originally submitted eleven different proposed discharge options, out of which the chancellor apparently considered and rejected several before arriving at the best resolution. Gulf Park should not now be heard to complain that the chancellor's decision is inviable. Second, the expense of connecting to the Ocean Springs water system, while high, is not clearly so high as to suggest a great inequity. Any easement would necessarily involve not just a passive use of the lagoon, but also an affirmative act by the golf course in dispersing the effluent on its greens and fairways. Certainly the cost of sprinkling this effluent would be a continuing obligation. The permanent easement likewise would have a monetary value. Finally, it is not clear to what extent Gulf Park might avoid additional operating and repair expenses by connecting with the Ocean Springs system. This solution may have other favorable consequences.
The chancellor's decision negating an implied easement is affirmed.

III.

Did the Chancellor Err in Finding Irreparable Harm and in Sustaining Jurisdiction?
Here Gulf Park launches a two-prong attack. First, it argues that the chancellor was manifestly wrong in finding that FOSDC and Pine Island met their burden of showing irreparable harm. Second, Gulf Park argues that the chancellor lacked jurisdiction to revise the conditions of its sewage discharge permit granted by the state.

A. Irreparable Harm.

Gulf Park argues the facts simply do not support the chancellor's opinion that the sewage effluent caused Pine Island's algae problems.
As stated in the facts, Pine Island maintained that the poorly treated, and in some instances untreated, sewage sprayed on the golf course caused algae to form on greens and some fairways, killing grass and making the course unplayable.
In their briefs, both Gulf Park and appellees FOSDC and Pine Island devote numerous pages to a discussion of the evidence at trial showing negligent operation of the plant and the resulting effect of the improperly treated effluent being sprayed on the golf course.
Before reaching the parties' extended discussions, however, it seems important to outline the applicable law.
The chancellor's order contains elements of prohibitory and mandatory injunctions since it requires Gulf Park to desist *1334 pumping sewage effluent into the lagoon and requires Gulf Park to seek another discharge point. We thus might consider the injunction as mandatory. See Hall v. Wood, 443 So.2d 834, 841 (Miss. 1983) (court treated injunction as mandatory based on "essence").
It is said "that a court of equity should grant a mandatory injunction with extreme caution... . [citation omitted] A mandatory injunction should be ordered where such is `the only effective remedy.'" Hall, 443 So.2d at 841. A mandatory injunction should never issue to require a "practical impossibility," Id., and the resulting pain and hardship should be considered. Id. However,:
The general rule is that a landowner is entitled to an injunction directing the removal of a trespassing structure on his land erected thereon by the owner of the adjoining land. The facts that the aggrieved owner suffers little or no damage from the trespass, that the wrongdoer acted in good faith and would be put to disproportionate expense by the removal of the trespassing structures, and that neighborly conduct as well as business judgment would require acceptance of compensation in money for the land appropriate, are ordinarily no reasons for denying an injunction. Rights in real property cannot ordinarily be taken from the owner at valuation, except under the power of eminent domain. Only when there is some estoppel or laches on the part of the plaintiff, or a refusal on his part to consent to acts necessary to the removal or abatement which he demands, will an injunction ordinarily be refused. Turner v. Morris, 196 Miss. 297, 17 So.2d 205 (1944).
Shattles v. Field, Brackett & Pitts, Inc., 261 So.2d 795, 797-98 (Miss. 1972). Shattles goes on to hold that a trespassing structure will ordinarily be a proper subject of an injunction unless there operates some estoppel, laches or a refusal on the part of the land owner to allow the acts necessary to abate the trespass. Id. at 798. The Court noted that "land is per se property of peculiar value, and will be protected by injunction without reference to its quality, use, or value." Id.
Shattles was cited approvingly in Phillips v. Davis Timber Co., Inc., 468 So.2d 72 (Miss. 1985). In Phillips this Court reversed a chancellor who failed to grant relief to a landowner whose lake had been polluted from release of pentachlorophenol, or PCP. The Court considered this invasion a nuisance, and held that Phillips was entitled to an injunction prohibiting further pollution of his lake. Id. at 79.
These cases stand for the proposition that an injunction will be available, despite the absence of demonstrable harm, to prevent a trespass or abate a nuisance. Since Gulf Park has no easement, Pine Island in effect met its burden of showing irreparable harm by establishing a continuing trespass.
In addition, Gulf Park argues that through enforcement proceedings brought by the State Bureau of Pollution Control, there exists an adequate remedy of enforcement and/or damages, making the harsh remedy of injunctive relief inappropriate. With this we cannot agree. Miss. Code Ann. § 49-17-43 (Supp. 1987).

B. Jurisdiction.

First, though we do not decide the question, it is not clear that the Commission's statutory mandate under Miss. Code Ann. § 49-17-43 prohibits a private suit for injunctive relief. See cases collected at Annot. 60 A.L.R.3d 665 (1974 & Supp.). Second, and more importantly, as discussed below under Point III B, the Commission lacks authority to decide the issue presented.
Here Gulf Park argues that by upholding the injunction, this Court would be usurping the regulatory power vested in the Mississippi Commission on Natural Resources and the Bureau of Pollution Control Permit Board. See Miss. Code Ann. § 49-17-29(3) (Supp. 1987). Under § 49-17-29(3), the Permit Board has exclusive administrative authority to issue, deny, modify or revoke permits under the Solid Wastes Disposal Law of 1974 (Miss. Code Ann. §§ 17-17-1  47).
*1335 The enabling statutes do not grant the Commission or the Permit Board the power of eminent domain.[1] Without such statutory power, the state may not, by a water disposal permit, effect a taking of property even with appropriate compensation. Without doubt, the Permit Board is well advised to require proof from those seeking permits that they have the necessary rights of way, at least in place, or require eminent domain proceedings. With no authority to effect a taking, or to remove clouds from titles, the Commission is without authority to resolve the disputed property question.
Chancery court does have jurisdiction over disputes contesting possession of and title to real property. Miss. Const. 1890 § 160.
Having jurisdiction to effect the use and exercise of the permit by way of determining property rights, the chancellor cannot simply leave the parties in a lurch. In retaining continuing jurisdiction, the chancellor entered the vacuum left by virtue of denying Gulf Park a discharge point. As to whether the chancellor might continue to exercise jurisdiction over the plant's operation even after Gulf Park has established an approved authority to determine the entire case. See Griffith, Mississippi Chancery Practice, § 437 at 434 (2d ed. 1950).
Retaining jurisdiction of the operation of the plant appears to be the only sensible remedy until such time as a new waste disposal permit is issued by the Permit Board. Admittedly, supervision of compliance with state and federal waste disposal guidelines might be better left to the Natural Resources Commission and the Bureau of Pollution Control. Here, however, a permit has been effectively revoked or altered because of the failure of the permittee to acquire or establish the necessary easements to comply with its permit. In such a case, the permit is effectively revoked or altered, and thus operation pursuant to the permit cannot continue. We think the chancellor arrived at a workable solution, and he should retain jurisdiction over operation of the plant until such time that Gulf Park either relinquishes its ownership or obtains a permit authorizing discharge at another location.

IV.

Did the Chancellor Err in Granting Damages?
Since Gulf Park did not have an easement, discharging effluent into the lagoon was a trespass or a nuisance. However, when Blossman discovered the trespass and reached an agreement with LeFeve and Fowlkes to continue to allow Gulf Park to discharge into the lagoon if Gulf Park paid for the electricity and water, Blossman, on behalf of FOSDC and Pine Island, created a license. See Towles v. Hodges, 235 Miss. 258, 108 So.2d 884 (1959) (licenses may be made in parol).
This Court does not recognize "irrevocable licenses." See Fourth Davis Island Land Co. v. Parker, 469 So.2d 516, 524-25 (Miss. 1985); Belzoni Oil v. Yazoo M.V.R. Co., 94 Miss. 58, 47 So. 468, 472-73 (1908); see also Reid v. Horne, 187 So.2d 316 (Miss. 1966). Thus, Gulf Park had only a license which Blossman and FOSDC could revoke. Towles, supra.
The chancellor held that damages in favor of FOSDC and Pine Island should be based on what Gulf Park, through LeFeve and Fowlkes, agreed to pay during the time it exercised permissive use of the lagoon. We cannot find fault with this assessment. Damages awarded on this use were well within the evidence.
Additional damages for Pine Island's use of fungicides to combat an algae problem present a closer question. The chancellor heard conflicting evidence on this issue.
Thomas Wilson, a chemist and owner of Micro-Methods, Inc., and David Steele a turf consultant with a degree in agronomy from Mississippi State University, both testified that the high amount of nitrogen and other organic materials in the effluent, coupled *1336 with a soil sodium level, which caused water to stand on courses, combined to feed a rapid growth of the algae.
Gulf Park, on the other hand, had proof that the soil under the course was mostly sand, and thus not unporous. Second, on cross-examination by Gulf Park, Steele testified that a high sodium level in soil could be improved, and thus the permeability of the soil improved, by applying agricultural lime. Lime is basically inexpensive. In addition, Dr. Ed Cake, a biologist and acknowledged expert on oyster biology, testified that the ground water in the area of the golf course contained high levels of sodium. Pine Island and FOSDC's expert found "substantial" levels of sodium in the ground water, but not high levels. This is important because Pine Island dug its own wells to provide water to the course after Johnson cut off a fresh water pipe to the course. Thus, Pine Island contributed to any high sodium level.
All other factors contributing to the growth of algae could be, or were exclusively, controlled by Pine Island, according to much of the testimony.
Except when rain caused potential flash flooding problems, watering the course from the lagoon was entirely under Pine Island's control. The spores and innoculants necessary for the growth of algae were omnipresent.
Pine Island could substantially reduce the nitrogen and other organic materials which feed the algae growth by applying fertilizer at a lesser rate.
Dr. Dick Yager, an expert with a doctorate in plant pathology, testified that the effluent water was not the cause of the algae problems at the golf course. Yager testified that the algae problem could be controlled by changing the watering schedule to prevent water from standing for long periods; begin collecting grass clippings; and, decreasing the amount of fertilizer.
Though we might have decided the issue differently, based on the conflicting evidence at trial, we cannot find the damage award to be lacking support in the record. It is thus beyond our authority to disturb.
For the reasons stated, we affirm the chancellor's decree of February 25, 1985.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
NOTES
[1] See, however, Miss. Code Ann. § 49-17-311(r) (Cumm.Supp. 1987) (granting to the Mississippi Gulf Coast Regional Wastewater Authority the power of eminent domain).